EDWARD J. SWEENEY & SONS, INC., Mission Gas Oil Company, Inc., and Petroleum Products Company

v.

TEXACO, INC.

Civ. A. No. 74–3299.

United States District Court, E. D. Pennsylvania.

Aug. 31, 1979.

On Injunctive Relief Sept. 4, 1979.

Mitchell A. Kramer, Steven Kapustin, Philadelphia, Pa., for plaintiffs.

Randall B. Robinson, Texaco, Inc., White Plains, N. Y., Duane, Morris & Heckscher, Jane D. Elliott, Philadelphia, Pa., Kay, Scholer, Fierman, Hays & Handler, Ira S. Sacks, New York City, for defendant.

## MEMORANDUM

CAHN, District Judge.

On the eighth day of trial in this labyrinthine antitrust case I directed a verdict in favor of the defendant. (N.T. 1860). The directed verdict did not dispose of all of the issues in the case, however, and the parties agreed to resolve one of these issues amicably and to submit the others to this court for a decision based on their written briefs.[1] (N.T. 1889–91). Now that I have received those briefs and had an opportunity to carefully review the record, I will explain why I decided to grant the defendant's motion for a directed verdict. I will also rule on one of the two issues which remain in this case. Before undertaking that task, however, I wish to set forth the facts and procedural history of this litigation.[2]

---

[1] The issue which the parties have agreed to resolve amicably involves a contract claim by plaintiff Sweeney against Texaco. The issues which remain for the court's decision are Texaco's counterclaims against Sweeney and the plaintiffs' claims for injunctive relief. I will decide Texaco's counterclaims in Part VIII of this opinion, but plaintiffs' claims for injunctive relief will be the subject of a separate opinion.

[2] Due to the procedural posture of the case, this account of the facts will reflect only those which are uncontroverted. Inferences will be drawn in favor of the plaintiff. *Columbia Met-*

## I. *FACTS*

The plaintiff, Edward J. Sweeney & Sons, Inc. (Sweeney), is a wholesaler and distributor of Texaco gasoline in the Eastern Pennsylvania and Southern New Jersey markets.[3] In addition to its wholesale business Sweeney owns several retail gasoline stations.[4] The defendant, Texaco, Inc. (Texaco), is a refiner of gasoline and other petroleum products. Sweeney has been in the wholesale gasoline business since 1944.[5] (N.T. 90). After several years as a consignee and wholesaler for other companies it first became a Texaco wholesaler and distributor in 1958. (N.T. 90–94). It has remained a Texaco wholesaler and distributor up to the present time. (N.T. 94). In 1963 Sweeney and Texaco entered into a distributor agreement which ultimately led to this litigation. (1963 Distribution Agreement; Plaintiffs' Exhibit 4; N.T. 100).

Prior to 1965 Sweeney marketed gasoline through full-service gasoline stations. (N.T. 102). These stations provided services such as greasing, lubrication, and tuneups in addition to the selling of gasoline. (N.T. 101). Sometime in 1965 or 1966 Sweeney's stations began to sell gasoline at a discount. (N.T. 102). Although other discount gasoline stations sold only unbranded gasoline, the Sweeney stations sold Texaco branded gasoline at a price of between one and three cents per gallon less than the price of other branded gasoline sold in the area.[6] (N.T. 132, 145, 156–163). After the adoption of the discount concept, Sweeney's gallonage increased steadily until in 1968 it won a wholesaler's gasoline sales contest for having shown the highest gallonage increase of all the Texaco distributors in the area. (Plaintiffs' Exhibit 6).

As Mr. Richard V. Sweeney, president of the plaintiff corporation testified, the Sweeney stations were able to offer a discount primarily because of two factors:

(1) they ceased to offer any services other than the sale of gasoline and related products, becoming "gas & go" operations (N.T. 15, 102), and

(2) they had lower freight costs than their competitors due to their proximity to the Texaco terminal. (N.T. 179).

It is the second factor that forms the basis of the claims made in this case.

When Texaco sells gasoline to its distributors it charges a price which includes the cost of delivering the product to the distributor's bulk plant—a delivered price. (*See, e. g.* Plaintiffs' Exhibit 4). (N.T. 1251–56). However, if the distributor picks up the gasoline himself and thereby saves Texaco the cost of delivery, Texaco gives him a discount or hauling allowance. Although there are several methods by which Texaco could compute the amount of the hauling allowance (N.T. 34–37, 1251–56), in its dealings with Sweeney Texaco based the hauling allowance on the lowest common carrier rate applicable between a designated Texaco distribution point and the Sweeney bulk plant. (*See, e. g.,* Plaintiffs' Exhibit 5).[7] Since Sweeney had and continues to have its bulk plant in Pottstown, Pennsylvania, under this arrangement it could receive an allowance for the cost of hauling the product from the Texaco distribution point to Pottstown. (N.T. 109). From 1961 until

---

*al Culvert Co. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20 (3d Cir.), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978). *See Patzig v. O'Neil,* 577 F.2d 841 (3d Cir. 1978).

3. Plaintiffs Mission Gas Oil Co., Inc., and Petroleum Products Co., are distributors who bought gasoline from Sweeney. (Plaintiffs' Complaint ¶ 9 & 10). Their claims derive from Sweeney's and were not the subject of evidence introduced at trial. (*See* note 15, *infra*). Since the issues now before the court involve Texaco's liability to Sweeney for the actions it took toward Sweeney, this opinion will refer to Sweeney as the plaintiff.

4. Sweeney owns these stations through its subsidiaries. (N.T. 14; Defendant's Exhibit 196).

5. Sweeney began as a partnership which later became a corporation. Since the change in form is not relevant to this litigation, both the partnership and the corporation will be referred to as "Sweeney". (*See* N.T. 100).

6. Unbranded gasoline or stations are those that are not identified with a major oil company. (N.T. 93–94, 123).

7. This exhibit was introduced but not admitted into evidence at the trial.

1970, the distribution point which Texaco designated as Sweeney's pick up point was the Texaco bulk plant in Westville, New Jersey. (N.T. 172). Sweeney thus received a hauling allowance based on the lowest common carrier rate applicable between Westville and Pottstown. (N.T. 174).

Between 1965 and 1970 Sweeney acquired numerous retail gasoline stations within approximately twenty miles of Texaco's Westville, New Jersey, terminal. (N.T. 120–46, 177). Although most of these stations had been selling unbranded gasoline at a discount, upon acquisition by the Sweeney interests these stations became branded Texaco stations. (N.T. 120–46).[8] Unlike other branded stations, however, the Sweeney stations sold branded gasoline at a discount; they generally tried to price their product above unbranded but below branded gasoline. (N.T. 128–133). It was the hauling allowance that subsidized this practice. (N.T. 118).

Due to the proximity between these newly acquired Sweeney stations and Texaco's Westville bulk plant, Sweeney could pick up the product in Westville and transport it a short distance to its New Jersey and Philadelphia area stations. (N.T. 176–7). Sweeney did not transport all of the product it picked up at Westville to its bulk plant in Pottstown. This practice enabled Sweeney to receive an allowance for hauling product from Westville to Pottstown (roughly fifty miles), when in reality it was hauling product from Westville to points ten to twenty miles away.[9] (N.T. 177–179). (See Defendant's Exhibit 1). Receipt of this allowance

permitted Sweeney to cut its costs and sell gasoline at a discount. (Id. 178–9). In effect the hauling allowance underwrote the discount.

After adopting the concept of selling branded gasoline at a discount through "gas & go" stations Sweeney prospered. Its prosperity did not augur well with its competitor Texaco retailers, however, and some of these retailers complained to Texaco that Sweeney's discount pricing was hurting them. (N.T. 418). Sweeney contends that Texaco conspired with these retailers to raise the cost of Texaco gasoline to Sweeney and thus force Sweeney to raise its prices. It cites the actions of Texaco in 1970 and 1971 as evidence of this alleged conspiracy.

In the winter of 1970, Texaco personnel informed Sweeney that Texaco wished to change the Sweeney pick up point from Westville, New Jersey, to Macungie, Pennsylvania, where Texaco had a pipeline terminal. (N.T. 197). Macungie, Pennsylvania, is much closer to Pottstown (approximately twenty miles) than Westville, New Jersey (approximately fifty miles), and this change would have had the effect of reducing Sweeney's hauling allowance by about fifty percent (N.T. 180). (See Defendant's Exhibit 1). Given the importance of the hauling allowance to Sweeney's competitive position, Sweeney strenuously objected to this change. (N.T. 180).[10] Texaco then notified Sweeney that it was exercising its right to cancel the 1963 distributor agreement.[11] (N.T. 180–81; Plaintiffs' Exhibit

8. Only one of the stations acquired by Sweeney during this period was a branded station (N.T. 144); the station in Essington, Pennsylvania, had been a Gulf station. (Id.).

9. Sweeney did have some stations in the Pottstown area, and it therefore hauled some of the product to Pottstown. (N.T. 107, 117, 177). However, it is the existence of the stations close to Westville and Sweeney's practice of direct delivery that is material to this case.

10. In 1967 Texaco had decided that it would be economically advantageous for it to have Sweeney pick up its product at the Texaco terminal in Macungie, Pennsylvania, rather than at the Westville terminal and it proposed this change

to Sweeney. (See Plaintiffs' Exhibit 39; Defendant's Exhibit 439; N.T. 1287–1298, 1365–1375). Sweeney objected to such a change, and it was not put into effect. (N.T. 181–184). The incident is mentioned here only for the sake of completeness; whatever favorable inferences Texaco would have a jury draw from it are rejected in light of the procedural posture of the case.

11. This agreement contained a clause which allowed either party to cancel it by serving written notice of their intention sixty days prior to its anniversary date. (See Plaintiffs' Exhibit 4).

8). As a result of negotiations between Texaco and Sweeney, however, Texaco agreed to continue to give Sweeney the Westville to Pottstown hauling allowance for an additional ninety days. (N.T. 187–188; Plaintiffs' Exhibit 10). This was designed to allow Sweeney to either adjust its operation to the new pick up point or seek an alternative source of supply.

Notwithstanding its efforts to that end Sweeney was unable to secure another supplier. (N.T. 188–190; Plaintiffs' Exhibits 19a–19u). In March of 1971, after further negotiations the parties arrived at a compromise: Sweeney would receive the Macungie to Pottstown hauling allowance effective June 1, 1971, but it would be permitted to pick up product at either the Westville or Macungie terminals. (March 1 letter agreement; Plaintiffs' Exhibit 10). This enabled Sweeney to continue to supply its southern New Jersey stations from the Westville terminal and mitigated the effect of the change in the hauling allowance.[12]

In December of 1971, however, Texaco notified Sweeney that effective February 29, 1972, it would terminate both the 1963 distributor agreement and the March 1 letter agreement. (N.T. 193–194; Plaintiffs' Exhibit 16). Although Sweeney again tried to obtain an alternate source of supply, it was again unsuccessful. (N.T. 197–199). After various negotiations, during which Sweeney threatened to seek injunctive re-

lief, Texaco agreed to continue supplying Sweeney until such a time as it gave Sweeney ten days notice of its intention to discontinue its supply. (Defendant's Exhibit 68A).[13] Sweeney does not contest the fact that Texaco never gave it such notice; indeed, Texaco has continued to supply Sweeney up to and including the present time.[14]

## II. ALLEGATIONS

In 1974, wary of the tolling of the statute of limitations, Sweeney brought the instant suit. Sweeney alleged that the 1970 change in Sweeney's hauling allowance resulted from a conspiracy between Texaco and other Texaco retailers. According to Sweeney the object of this alleged conspiracy was to fix the resale price of Texaco gasoline. (N.T. 1802). Furthermore, Sweeney alleged that the 1971 termination of its distributor agreement also resulted from a price fixing conspiracy. According to Sweeney these alleged conspiracies are violative of § 1 of the Sherman Act, 15 U.S.C. § 1, and entitle it to treble damages as well as injunctive relief.[15]

In addition Sweeney claimed that Texaco's actions in 1970 and 1971 constituted an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, and entitle it to treble damages as well as in-

12. In return for this arrangement Sweeney signed a document which Texaco characterizes as a covenant not to sue. (Defendant's Exhibit 3). This court has already ruled that the document does not constitute a covenant not to sue. (N.T. 1888). (See N.T. 542–545).

13. In return for Texaco's promise to continue supplying Sweeney, Sweeney allegedly agreed not to sue Texaco. (See Defendant's Exhibit 68A). Unlike the written agreement which followed the March 1 letter agreement, (see note 12 and accompanying text, supra), the agreement referred to here was not reduced to writing. This court has already ruled that whatever agreement Texaco reached with Sweeney on that issue does not constitute a covenant not to sue. (N.T. 1888).

14. Whether Texaco's failure to terminate this agreement resulted from the advent of federal regulation, as Sweeney alleges (N.T. 21) or from some other motive is irrelevant to this

case, which involves alleged conspiracies in 1970 and 1971. However, for purposes of this motion we will assume that, as Sweeney contends, Texaco would have ceased to supply Sweeney sometime after 1972 if federal regulations adopted after 1972 had not prevented it.

15. On June 1, 1979, this court granted the defendant's motion for partial summary judgment as to the claims of plaintiffs Mission Gas Oil Co. and Petroleum Products Co. for damages. The plaintiffs through their attorneys have represented to the court that denial of their claims for injunctive relief under §§ 1 and 2 of the Sherman Act follows from the grant of the defendant's motion for a directed verdict on plaintiff Sweeney's claims for damages under those sections. The court will dispose of all of the plaintiffs' claims for injunctive relief in a subsequent memorandum and order, however.

junctive relief.[16] Sweeney also charged that imposition of the Pottstown to Macungie hauling allowance made it the victim of price discrimination in violation of § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a). For this alleged violation Sweeney also sought damages and injunctive relief.[17] Other claims made by Sweeney were either resolved by agreement of counsel [18] or withdrawn.[19]

Texaco responded to these allegations by asserting that it had changed Sweeney's hauling allowance only because it was economically advantageous for it to do so and that it had terminated Sweeney because of Sweeney's breaches of the hauling agreement and distributor contract, complaints received from customers about the condition of Sweeney's stations, and, most importantly, the sale by Sweeney of non-Texaco gasoline and diesel fuel from Texaco pumps as well as its use of Texaco marked trucks to deliver non-Texaco gasoline. Texaco thus brought several counterclaims against Sweeney for Sweeney's alleged trademark infringement and breach of contract.[20] Although Texaco acknowledged that it had received complaints from other Texaco retailers about the competitive effect of Sweeney's discount pricing, Texaco vehemently denied that it had taken any action as a result of those complaints.

Thus, in response to Sweeney's § 1 claim Texaco argued that unilateral action did not violate § 1 of the Sherman Act and that mere complaints could not establish the existence of a conspiracy. In response to Sweeney's § 2 claim Texaco asserted that Texaco did not and indeed could not have attempted to monopolize the market of Texaco gasoline because Texaco gasoline did not represent a separate market. In response to Sweeney's Robinson-Patman § 2(a) claim Texaco argued that the change in Sweeney's hauling allowance did not violate that section because the hauling allowance is a functional discount which is not part of the price for purposes of the Robinson-Patman Act and that, in any event this court lacked jurisdiction to decide the claim due to the absence of sales made in interstate commerce. Texaco also argued that Sweeney had failed to prove that it sustained the kind of economic damage required for recovery under § 2(a) of the Robinson-Patman Act and could therefore recover nothing.

## III. PROCEDURAL HISTORY

After nearly five years of pretrial proceedings marked by discovery disputes the case was called for trial in March of 1979. However Sweeney, who had not filed its first set of interrogatories until January 31, 1979, argued that it could not proceed to trial at that time. The court agreed to give Sweeney further time to prepare the case but admonished that given the age of the case, it would not grant further continuances. On June 5, 1979, the case finally went to trial. Since Sweeney still claimed that it needed additional time to prepare certain aspects of the case, the court agreed to

16. See note 15 *supra* for the status of plaintiffs' claims for injunctive relief.

17. Plaintiffs have taken the position that the grant of the defendant's motion for a directed verdict on plaintiff Sweeney's claims for damages under the Robinson-Patman Act does not dictate the outcome of their claims for injunctive relief. They have submitted briefs on this issue, which this court will decide by subsequent memorandum and order.

18. Sweeney's claim for damages for Texaco's alleged breach of the hauling agreement was resolved with Texaco's agreement to pay Sweeney whatever they determined the applicable ICC common carrier rate to be. (N.T. 1781–83, 1860). The court will therefore dismiss this claim pursuant to Local Rule of Civil Procedure

23(b). However, the court will deny Texaco's request for reimbursement of expenses occasioned by any changes in plaintiffs' theory of damages. (N.T. 1783). This is a complicated case and I think it only fair that each side bear the burden of that complexity.

19. The plaintiff withdrew his claims under § 2(e) of the Robinson-Patman Act, 15 U.S.C. § 13(e). (N.T. 1781).

20. The court has not yet decided these claims, which the parties submitted for decision to this court following the grant of the defendant's motion for a directed verdict. The merits of these claims are discussed in Part VIII of this opinion.

tailor the trial schedule to Sweeney's needs. (N.T. 80). Based on its previous experience with this case the court was, however, unwilling to grant another continuance.

Throughout the trial the court allowed Sweeney to continue to conduct discovery. (N.T. 59–60, 339, 346). Indeed, on the first day of trial the court permitted a change in Sweeney's damage theory despite Texaco's claims that it would be prejudiced and put to considerable expense by such a belated alteration.[21] (N.T. 63–81, 332–47). I permitted this because, as I remarked from the bench, I did not want to see Sweeney's case "harmed through some inadvertent oversight." (N.T. 73). I am certain that no such harm has occurred. Sweeney presented all of the admissible evidence which it deemed necessary and cannot, five years after bringing the case, be heard to complain about inadequate preparation time.

On Monday, June 11, 1979, the fourth day of trial, Texaco gave this court a copy of its motion for a directed verdict. On the next day, when Sweeney was close to the conclusion of its case in chief, the parties discussed how the court should proceed. (N.T. 1236–1240). To accommodate the interests of judicial economy and fairness to the litigants, I decided to defer further consideration of the arguments raised by Texaco's motion until the following Monday.[22] Thus, after Sweeney rested, Texaco began to present its case.[23] By Monday, the date set for argument on its directed verdict motion, Texaco had rested and Sweeney had concluded its case in rebuttal. This procedure, agreed to by the parties, gave Sweeney ample time to reply to Texaco's motion and efficiently utilized the jury's time by keeping the case fresh in their minds and leaving it ready for their decision in the event that Texaco's motion for a directed verdict should be denied.[24]

On Monday, June 18, 1979, the eighth day of trial, I granted Texaco's motion for a directed verdict. In Part IV of this memorandum I will set forth the standards applicable to such a motion. In Parts V through VII I will discuss the issues raised by the motion and explain the reasons for my decision. In Part VIII I will discuss and decide the issues raised by Texaco's counterclaims for trademark infringement and breach of the distributor agreement.

## IV. STANDARDS APPLICABLE TO A MOTION FOR A DIRECTED VERDICT

Rule 50(a) of the Federal Rules of Civil Procedure allows a party to move for a directed verdict "at the close of the evidence offered by an opponent . . . ." To decide such a motion the trial judge must analyze all the evidence presented by the party opposing the motion, reviewing that evidence in the light most favorable to that party and making all inferences in his favor. *Continental Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962); *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum*

---

**21.** Sweeney wanted to change its damage theory from the difference between the Westville to Pottstown hauling allowance and the Macungie to Pottstown hauling allowance to the difference between the hauling allowance which Texaco gave Sweeney and that which Texaco gave Sweeney's competitors. (N.T. 62, 332–340). Although the court allowed Sweeney to do this, Sweeney seems to have relied on his original damage theory nonetheless. *See* notes 60, 66 *infra.*

**22.** Since the court planned to be in recess Thursday and Friday, Sweeney would have ample opportunity to prepare a reply.

**23.** This procedure is authorized by Fed.R.Civ.P. 50(a) which provides that,

A party who moves for a directed verdict at the close of the evidence offered by an opponent may offer evidence in the event that the motion is not granted, without having reserved the right so to do and to the same extent as if the motion had not been made.

**24.** Although the court once suggested the possibility of bifurcating the case, (N.T. 80) this suggestion was never adopted. Indeed, before the court heard oral argument on Texaco's motion, the parties had submitted points for charge and the court had circulated proposed jury interrogatories among counsel. If the court had denied Texaco's motion for a directed verdict it would have conducted a charge conference and proceeded to charge the jury as soon as practicable thereafter.

& *Chemical Corp.*, 579 F.2d 20, 25 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); *Fireman's Fund Insurance Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); *Denneny v. Siegel*, 407 F.2d 433, 439 (3d Cir. 1969); *Dovberg v. Dow Chemical Co.*, 353 F.2d 963, 968 (3d Cir. 1965), *cert. denied*, 384 U.S. 907, 86 S.Ct. 1344, 16 L.Ed.2d 360 (1966). The trial judge cannot pass on either the weight or the credibility of the evidence, *Brady v. Southern R. Co.*, 320 U.S. 476, 479–80, 64 S.Ct. 232, 88 L.Ed. 239 (1943), *Burchill v. Kearney-National Corp., Inc.*, 468 F.2d 384 (3d Cir. 1972), 5A Moore's Federal Practice, ¶ 50.02[1] at 50–25, since it must leave to the jury the task of "evaluat[ing] contradictory evidence and draw[ing] inferences therefrom." *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, 1178 (3d Cir. 1976), *cert. denied*, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977) (citations omitted). The trial judge, however, retains power to decide whether the evidence, so reviewed, would support a jury verdict in favor of the party opposing the motion. That party must have introduced more than a scintilla of evidence from which the jury could find in his favor; *Fireman's Fund Ins. Co. v. Videfreeze Corp.*, 540 F.2d 1171, at 1179 n. 6; *Denneny v. Siegel*, 407 F.2d 433 (3d Cir. 1969); 5A Moore's Federal Practice, ¶ 50.02[1] at 50–31 n. 22; he must have introduced sufficient evidence to support a jury verdict in his favor. *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 529 F.2d at 25; *Hourston v. Harvlan, Inc.*, 457 F.2d 1105, 1108 (3d Cir. 1972). If a reasonable jury could not find that the party opposing the motion for a directed verdict had proved his case by a preponderance of the evidence the trial judge must direct a verdict against him.

▮ Sweeney has failed to introduce even a scintilla of evidence in support of its claim. It follows that it has also failed to introduce sufficient evidence to support a jury verdict in its favor. I reached this conclusion after careful review of the evidence and with full awareness of the difficulties inherent in proving an antitrust conspiracy. *See Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). Like other courts, however, I recognized that "if an antitrust plaintiff, as well as any other plaintiff, does not present enough evidence within his case-in-chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party." *Chisholm Bros. Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1139–40 (9th Cir.), *cert. denied* 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).[25] I will not shirk that duty.

## V. SWEENEY'S DAMAGE CLAIMS UNDER § 1 OF THE SHERMAN ACT

▮ Section 1 of the Sherman Act proscribes "[e]very contract, combination, . . . or conspiracy, in restraint of trade . . ." 15 U.S.C. § 1. To establish a defendant's liability under this section a plaintiff must therefore prove that the defendant entered into a contract, combination, or conspiracy

---

**25.** Texaco has taken the position that *Chisholm* requires Sweeney to introduce direct evidence of a conspiracy to survive a motion for a directed verdict. I disagree. *Chisholm* establishes the quantum of evidence which the plaintiff must introduce; it does not restrict the quality of that evidence. A contrary reading would make it practically impossible for plaintiffs to prevail in cases like this and would ignore the concerns expressed by the Supreme Court in *Poller.* Indeed, in *Westinghouse Electric v. CX Processing Labs, Inc.*, 523 F.2d 668 (9th Cir. 1975), the same court that decided *Chisholm* noted that the party opposing the motion for a directed verdict "was entitled to benefit from all reasonable inferences to be drawn from its evidence." 523 F.2d at 673. If the court had required that the plaintiff present direct evidence of the existence of a conspiracy it would not have said anything about the need for drawing inferences. In any event, whatever the validity of Texaco's contention in the Ninth Circuit, the law in this circuit is to the contrary. In *Venzie Corp. v. United States Mineral Prod. Co., Inc.*, 521 F.2d 1309 (3d Cir. 1975), the court stated unequivocally that the plaintiffs "could rely on the inference of the existence of an agreement from circumstantial evidence." 521 F.2d at 1312.

and that said conspiracy constituted a restraint of trade. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). The issue in this case is whether Sweeney has introduced enough evidence to allow the jury to conclude that Texaco conspired to fix the retail price of Texaco gasoline.[26] On June 8, 1979, I ruled that Sweeney had failed to meet this burden.

 Sweeney alleged that Texaco violated § 1 of the Sherman Act by conspiring to change Sweeney's hauling allowance in 1970. Sweeney introduced two items of evidence in support of its § 1 claim. First, it showed that some Texaco retailers had complained to Texaco that Sweeney's policy of discount pricing was hurting their sales. Second, Sweeney produced one James P. Rodden, a former Texaco employee now working for a Sweeney-related enterprise, who testified he thought that Texaco had terminated Sweeney because of Sweeney's pricing policy. This evidence cannot, as a matter of law, support a jury finding of a contract, combination, or conspiracy between Texaco and other Texaco retailers either in 1970 or 1971.

Prior to the oral argument on Texaco's motion for a directed verdict Sweeney had not· specified the nature of this conspiracy or the identity of the putative co-conspirators. Even at oral argument the court was unable to obtain this information. (*Compare* N.T. 1802–08 with N.T. 1811–17). Before granting Texaco's motion I evaluated whether the evidence would support a finding of either a horizontal or vertical price fixing combination or conspiracy in either 1970 or 1971. I will follow that analysis here.

**A. 1970 COMBINATION OR CONSPIRACY—CHANGE IN SWEENEY'S HAULING ALLOWANCE.**

**1. HORIZONTAL PRICE FIXING AGREEMENT.**

 To find that Sweeney had introduced sufficient evidence to allow the jury to conclude that Texaco had conspired with other Texaco retailers to fix the retail price of Texaco gasoline I would have to find that competitors' complaints, without more, permit an inference of concerted action.[27] Like numerous courts before me, I hold that evidence of competitors' complaints standing alone cannot support a finding of liability under § 1 of the Sherman Act. *Westinghouse Electric Corp. v. CX Processing Laboratories*, 523 F.2d 668 (9th Cir. 1975); *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963); *Carr Electronics Corp. v. Sony Corp. of America*, 472 F.Supp. 9 (N.D.Cal.1979); *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D.N.Y.1968).

In *Carr Electronics Corp. v. Sony Corp. of America*, 472 F.Supp. 9 (N.D.Cal.1979), the court faced this precise issue. Carr, a dealer of Sony products, claimed that Sony had terminated its dealership because Carr had adopted a discount pricing policy as a result of which Carr's competitors had "complained forcefully to Sony that they were unhappy with the fact that several low-overhead dealers were underselling them." 472 F.Supp. at 10 (footnote omitted). Carr thus brought an action against Sony alleging that Sony had conspired to fix the retail price of television sets and thus violated § 1 of the Sherman Act. Faced with Sony's motion for summary judgment, Carr argued

---

**26.** There is no question that such a conspiracy, if established, would constitute an unreasonable restraint of trade. *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979). *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940).

**27.** Such a combination, if shown, would effect a horizontal restraint. As the court of appeals explained in *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979),

[I]f the action of a manufacturer or other supplier is taken at the direction of its customer, the restraint becomes primarily horizontal in nature in that one customer is seeking to suppress its competition by utilizing the power of a common supplier. Therefore, although the termination in such a situation is, itself, a vertical restraint, the desired impact is horizontal and on the dealer, not the manufacturer, level.

595 F.2d at 168.

[T]hat the court must, as a matter of law, permit the inference that the complaints of the dealers, followed by Sony's termination of Carr, constitutes an illegal combination in violation of the antitrust laws. *Id.* 472 F.Supp. at 12. The court rejected that argument.

Like Sweeney, Carr relied on *Girardi v. Gates Rubber Company Sales Division, Inc.,* 325 F.2d 196 (9th Cir. 1963). Like the *Carr* court, I find that the facts of *Girardi* were "much more extreme than those of the instant case," 472 F.Supp. at 13, and that Sweeney's reliance on *Girardi* is unwarranted.

The plaintiff in *Girardi* was a discount dealer of the defendant's products who had argued that its termination by the defendant had come as a result of complaints by the plaintiff's competitors. Unlike the plaintiffs in both *Carr* and the instant case, however, the plaintiff in *Girardi* had shown that one of the defendant's salesmen had actually threatened him with termination if he did not cease discount pricing. 352 F.2d at 198. There is simply no such evidence in this case. Indeed, Sweeney's president testified that Texaco never interfered with the way in which Sweeney arrived at the price at which it sold gasoline (N.T. 382),[28] and that Texaco had never threatened to take any action in response to Sweeney's marketing practices (N.T. 379).[29]

Moreover, the internal memoranda of the defendant in *Girardi* showed that management was concerned about exercising control over the dealer's marketing practices and actively sought ways of exercising that control. Again, there is simply no such

evidence in this case. Although Texaco's management was aware of the complaints, there is no evidence to show that it took any action in response to them. There is, however, an abundance of evidence that Texaco had other, legitimate reasons for changing Sweeney's hauling allowance and terminating its distributor agreement.[30] Thus, a marketing study conducted by Texaco had demonstrated that it would be more economical for Texaco to have Sweeney pick up at Macungie instead of at Westville. (Plaintiffs' Exhibits 35, 39; Defendant's Exhibit 438–439; N.T. 1287–1298, 1365–1378). Furthermore, Texaco had received numerous complaints from customers regarding the condition of Sweeney owned stations and had misgivings over Sweeney's credit card practices. (N.T. 1304–1322). Most importantly, Texaco was concerned about Sweeney's undisputed practice of comingling Texaco gasoline with gasoline purchased from other refiners, selling non-Texaco diesel fuel from Texaco pumps and using Texaco branded trucks to deliver non-Texaco gasoline.[31] (N.T. 1313; Plaintiffs' Exhibit 18; Defendant's Exhibits, 55, 64, 66, 435A–K). Significantly, the defendant in *Girardi* could point to no other justification for its actions, and indeed was so bold as to terminate the plaintiff's dealership in two areas where he engaged in discounting but not in a third where he did not engage in discounting. There is no similar evidence in this case, therefore like the *Carr* court, I have concluded that

[I]t was on a much more forceful record that the *Girardi* court held that the jury should be permitted to infer a combina-

---

**28.** By Texaco's counsel to Mr. Sweeney:
Q Now, my tenth and last question to you, Mr. Sweeney, is has Texaco ever interfered in the method or manner by which E. J. Sweeney and Sons Incorporated arrived at the price at which your company sold gasoline to any of your customers?
A No.
(N.T. 382).

**29.** By Texaco's counsel to Mr. Sweeney:
Q Question Number 7, did Texaco ever take any action or threaten to withhold any action or refrain from performing certain acts should you market gasoline in a way that you

felt was desirable, and which for one reason or another Texaco felt was undesirable?
A No.
(N.T. 379).

**30.** This evidence cannot and does not serve as the basis for my decision. I am noting it only to show the contrast between the strength of the facts in *Girardi* and the weakness of the facts in the case at bar.

**31.** These actions are the subject of Texaco's counterclaims against Sweeney, which will be discussed and decided in Part VIII hereof.

tion in violation of section 1 of the Sherman Act. The mere fact that dealers complained does not require sending the case to the jury, despite the appeal of some of the *Girardi* court's language. 472 F.Supp. at 13.

Even the facts of *Carr* itself are stronger than the facts of this case. In *Carr*, there was evidence, albeit of doubtful admissibility, that one of the defendant's salesmen had told the plaintiff that other retailers were complaining and that the defendant "intended to take some action." *Id.* at 13 n. 5. Sweeney never even attempted to introduce any evidence that Texaco either responded to the complainants or told Sweeney that it would take any action in response thereto. My decision in this case thus follows *a fortiori* from the court's decision in *Carr*.

Other courts agree. In *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D.N.Y.1968), the plaintiff, a wholesaler of steel products, alleged that the defendant manufacturer had conspired with other wholesalers in violation of § 1 of the Sherman Act. The plaintiff sought to survive the defendant's motion for summary judgment by arguing that evidence of complaints to the defendant manufacturer by plaintiff's competitors would permit an inference of conspiracy. The court rejected this argument and held that,

> A combination violative of Section 1 of the Sherman Act cannot be implied from the fact that some of Wood's customers complained of Carbon Steel's practices, since it was the normal working of the marketplace for them to have done so. Cf. *Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963).

289 F.Supp. at 588.

Sweeney has shown even less evidence of a conspiracy than the plaintiff in *Carbon Steel*. In that case the plaintiff had sub-

mitted copies of memoranda drafted by the defendant's district sales manager to the attention of a marketing vice president and a general manager; after explaining the substance of the complaints received from plaintiff's competitors, these memoranda "urged that all business relations with Carbon Steel be severed." 289 F.Supp. at 587. The court nevertheless granted the defendant's motion for summary judgment on the ground that the plaintiff had failed to demonstrate the existence of a combination. A similar conclusion follows in this case. Sweeney has not even introduced evidence of internal memoranda and in light of the *Carbon Steel* holding Sweeney can hardly maintain that mere discussion of the complaints by Texaco management suffices to show the existence of a combination or conspiracy.

*Carbon Steel* illustrates the difference between the type of internal communications which permit the inference of a combination and those which do not. In the former situation the communications show that the manufacturer knew of the complaints and planned specific actions in response thereto *(Girardi)*. In the latter situation the communications show only that the manufacturer knew of the complaints *(Carbon Steel, Carr)*. The courts agree that where the communications show only the manufacturer's knowledge they cannot serve as the basis for an inference of a combination *(Carbon Steel, Carr)*, whereas if the communications show knowledge plus an intent to act on the complaints, they can *(Girardi)*.

■ This conclusion has its genesis in sound policy considerations, as the *Carbon Steel* court noted. It would be inequitable to hold that the mere receipt of a complaint creates an inference of a combination between the recipient and the complainant.[32] The recipient of the complaint cannot help

---

**32.** It is irrelevant that the making of such a complaint could be construed as violative of § 1 of the Sherman Act. *See* note 27 *supra.* Even if that were so, to draw an inference of combination between the maker and the recipient of a complaint from the mere receipt of a complaint would be somewhat like holding that the

subject of an attempted bribe is guilty of bribery. The issue of the complainant's liability is not before me, however, and I express no view on its merits. Neither Sweeney nor the plaintiffs in *Carr* or *Carbon Steel* sought to hold their competitors liable for violations of § 1 of the Sherman Act.

receiving the complaint and it would be unfair, without additional evidence of the existence of a conspiracy, to hold him liable for something over which he has no control. It is only if he acts upon the complaints, thereby becoming more than a passive recipient, that he turns into a coconspirator and violates the antitrust laws. As the court of appeals has noted, "[t]he substantive law of trade conspiracies requires some consciousness of commitment to a common scheme." *Klein v. American Luggage Works, Inc.*, 323 F.2d 787, 791 (3d Cir. 1963), *quoting United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963). *See Harold Friedman, Inc. v. Kroger Co.*, 581 F.2d 1068, 1078 (3d Cir. 1978). I can perceive no reason for departing from this rule.

Contrary to Sweeney's assertions, *Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979), does not require a different result. In *Cernuto* the court of appeals decided that an agreement between a manufacturer and one of his customers to refuse to deal with another customer would constitute a *per se* violation of § 1 of the Sherman Act. The plaintiff in *Cernuto* was a discount seller of the defendant's products. The plaintiff alleged that the defendant, at the insistence of one of plaintiff's competitors, had refused to deal with the plaintiff. Since plaintiff could not prove that the defendant's conduct had any anticompetitive effect, he could recover only if the court held that the defendant's conduct constituted a *per se* violation of § 1. 595 F.2d at 165. For the sole purpose of deciding the propriety of the district court's grant of the defendant's motion for summary judgment the court of appeals assumed

that the plaintiff could show that the manufacturer terminated him as a result of the complaints. *Id.* The court carefully pointed out that it had before it only the question of

> [W]hether the conduct at issue here—a manufacturer deliberately withdrawing its product from a distributor that resold it for a price less than its competitors *at the request* of a competitor—should be classified as a *per se* violation of the [Sherman] Act.

595 F.2d at 166 (emphasis added). It answered that question in the affirmative.

*Cernuto* does not govern this case, however. There is no question that if Sweeney had succeeded in proving the allegations in its complaint it would have made out a *per se* violation of the Sherman Act; that is all that *Cernuto* decided. The issue in this case—whether complaints permit the inference of a combination—was neither considered nor decided by the *Cernuto* court. Indeed the instant case presents the question that the trial judge in *Cernuto* will have to decide upon remand: whether the plaintiff has introduced enough evidence of the allegations in his complaint to allow a jury to find in his favor. Thus, the court of appeal's decision in *Cernuto* does not foreclose a decision favorable to the defendant in this case.[33]

Aside from the evidence of complaints which other retailers made to Texaco, Sweeney introduced no evidence of a conspiracy between Texaco and its retailers or wholesalers. I have concluded that on the basis of such evidence no reasonable jury could find that Texaco engaged in a combi-

---

**33.** Neither does the more recent decision in *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 610 F.2d 1059 (3d Cir. 1979), filed subsequent to my ruling on Texaco's motion for a directed verdict in this case, command a different result. In *Mannington,* as in *Cernuto,* the antitrust claims were decided on a motion for summary judgment; therefore, as in *Cernuto,* the court in *Mannington* assumed the existence of an agreement between the plaintiff licensee and the defendant licensor to terminate competing licenses. At 1070. The court decided only whether that agreement violated the antitrust laws or whether the defendant's "sta-

tus as a patent monopolist immunize[d] this otherwise actionable conduct from antitrust attack." At 1070. The court did not purport to decide the question at issue here.

Moreover, the *Mannington* court objected to the entry of summary judgment before the plaintiffs had a full opportunity to conduct discovery. In this case, however, Sweeney has had ample opportunity to conduct all the discovery it desired and has received numerous indulgences from the court to that end. *See* Part III, *supra*. It cannot claim that its lack of evidence results from an inadequate opportunity to conduct discovery.

nation or conspiracy in restraint of trade by changing Sweeney's hauling allowance in 1970.

## 2. VERTICAL PRICE FIXING—RETAIL PRICE MAINTENANCE.

█ Sweeney also argued that Texaco conspired with the complaining dealers to maintain the resale price of Texaco gasoline.[34] Alternatively, Sweeney argued that Texaco conspired with Sweeney as of the time Sweeney agreed to the change in the hauling allowance. Sweeney cites *Albrecht v. Herald Co.*, 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), in support of these contentions. However, as the Court of Appeals for the Second Circuit noted in *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir. 1978), to succeed in such a claim the plaintiff must prove that the manufacturer had a program of resale price maintenance, that it sought the aid of plaintiff's competitors in enforcing said program, and that its actions toward plaintiff were designed to secure compliance with the desired resale price. Sweeney has neither alleged nor proved any of these things.

█ In *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), the Supreme Court made it clear that unilateral action by a manufacturer does not violate § 1 of the Sherman Act. This basic premise remains unchanged despite a series of Supreme Court decisions which defined and narrowed the limits of unilateral behavior. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960); *United States v. Bausch & Lomb Optical Co.*, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); *F.T.C. v. Beech-Nut Packing Co.*, 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); *Frey & Son, Inc. v. Cudahy Packing Co.*, 256 U.S. 208, 41 S.Ct. 451, 65 L.Ed. 892 (1921); *United States v. A. Schrader's Son, Inc.*, 252 U.S.

85, 40 S.Ct. 251, 64 L.Ed. 471 (1920); *Areeda*, Antitrust Analysis, 559–560 (1974).

The defendant in *Colgate* was a manufacturer who had published lists of the prices at which its products should be sold and had announced that it would refuse to sell to any dealers who failed to charge those prices. The Court refused to find that such conduct violated § 1 of the Sherman Act and held that,

In the absence of any purpose to create or maintain a monopoly, [which would bring the case under § 2, not § 1] the act does not restrict the long recognized right of trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell.

250 U.S. at 307, 39 S.Ct. at 468. The Court thus distinguished Colgate's practice from that which it had condemned in *Dr. Miles Medical Co. v. Park & Sons Co.*, 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911), where "the unlawful combination was effected through contracts which undertook to prevent dealers from freely exercising the right to sell." 250 U.S. at 307–08, 39 S.Ct. at 468.

█ Through a series of decisions culminating with *United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960), the Court blurred the seemingly clear line between conduct permitted (*Colgate*) and proscribed (*Dr. Miles*) by § 1 of the Sherman Act. The defendant in *Parke Davis* had announced that it would refuse to sell to wholesalers who sold to retailers who failed to charge the resale prices specified by Parke Davis. Parke Davis effectuated this policy by supplying wholesalers with the names of retailers who refused to charge the prices specified by Parke Davis; the wholesalers then had to either stop supplying the offending retailers or face the loss of supplies from Parke

---

**34.** The term retail price maintenance will be used herein to refer to any attempt by Texaco to influence the retail price of its gasoline, even if such an attempt extends only to attempting to raise or lower the price without setting forth a specific figure.

Davis. In holding that this scheme violated the Sherman Act the Court reasoned that by

> [T]hus involving the wholesalers to stop the flow of Parke Davis products to the retailers, thereby inducing retailers' adherence to its suggested retrial prices, Parke Davis created a combination with the retailers and the wholesalers to maintain retail prices . . . . Although Parke Davis' originally announced wholesalers' policy would not under Colgate have violated the Sherman Act if its action thereunder was the simple refusal without more to deal with wholesalers who did not observe the Wholesalers' Net Price Selling Schedule, that entire policy was tainted . . . when Parke Davis used it as the vehicle to gain the wholesalers' participation in the program to effectuate the retailers' adherence to the suggested retail prices. . . .

362 U.S. at 45–6, 80 S.Ct. at 512–513. The Court thus identified the factors which a plaintiff must establish before a jury can find liability for resale price maintenance under § 1 of the Sherman Act:

> 1. the announcement of a suggested retail price;
>
> 2. procurement of competitors' assistance in insuring compliance with that price.

Since Sweeney has not alleged that Texaco had any announced retail prices it has failed to fulfill the first requirement of *Parke Davis*.[35]

■ Even if I found that announcement of suggested retail prices was not required for a finding of liability under *Parke Davis*, I would nevertheless have to hold that

Sweeney has failed to show that Texaco entered into a combination, as defined by the *Parke Davis* court. Sweeney has not introduced any evidence from which a jury could reasonably infer that Texaco took "affirmative action" to ensure adherence to some particular resale price.[36] *Compare United States v. Parke, Davis & Co.*, 362 U.S. at 47, 80 S.Ct. 503 (1960) (Court held that when manufacturer takes affirmative action to achieve uniform adherence to a particular price he engages in concerted action and violates § 1 of the Sherman Act). Sweeney has shown only that other retailers complained to Texaco. Like other courts, I find that such evidence does not permit an inference of concerted action. *Westinghouse Electric Corp. v. CX Processing Laboratories*, 523 F.2d 668 (9th Cir. 1975); *Butera v. Sun Oil Co., Inc.*, 496 F.2d 434 (1st Cir. 1974); *Dart Drug Corp. v. Parke, Davis & Co.*, 120 U.S.App.D.C. 79, 344 F.2d 173 (1965); *Klein v. American Luggage Works, Inc.*, 323 F.2d 787 (3d Cir. 1963); *Carbon Steel Products Corp. v. Alan Wood Steel Co.*, 289 F.Supp. 584 (S.D.N.Y. 1968); *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.*, 602 F.2d 1025 (2d Cir. 1979); *Carr Electronics Corp. v. Sony Corp. of America*, 472 F.Supp. 9 (N.D.Cal.1979).

In *Westinghouse Electric Corp. v. CX Processing Laboratories*, 523 F.2d 668 (9th Cir. 1975), a retailer sued a manufacturer when the manufacturer refused to fulfill the terms of a contract which gave the retailer a more favorable price than that available to the retailer's competitors. The retailer alleged that the manufacturer's conduct resulted from a combination or conspiracy to stabilize prices between the manufacturer and the retailer's competitors.

---

**35.** Sweeney has even failed to establish that Texaco had any policy whatsoever on the level of their retail prices. *See* note 34 *supra*.

**36.** Courts have long distinguished between a manufacturer who takes affirmative action to ensure compliance with his pricing policies (unlawful) and a manufacturer who merely announces such a policy (lawful). In *Gray v. Shell Oil Co.*, 469 F.2d 742 (9th Cir. 1972), *cert denied*, 412 U.S. 943, 93 S.Ct. 2773, 37 L.Ed.2d 403 (1973), the court instructed the jury that the key issue was

> [W]hether Shell dealers were free to make their own pricing decisions or whether Shell deprived its dealers of their free choice by use of affirmative conduct. . . .
>
> The distinction . . . between 'coercion' on the one hand and 'exposition, persuasion and argument' on the other, . . . is firmly imbedded in the decisional law on vertical price-fixing." 469 F.2d at 747–48 (citations and footnotes omitted).

As evidence of this combination the retailer showed that its competitors had called the manufacturer to request that the manufacturer give them the same price offered to the retailer pursuant to the terms of the contract.[37] The retailer also introduced the testimony of one of its principal owners who had said that *in his opinion* the conversations between the manufacturer and the other retailers had resulted in an agreement to fix prices. Faced with such meager evidence, which nevertheless exceeds that presented by Sweeney in this case,[38] the district court directed a verdict in favor of the defendant. The Court of Appeals for the Ninth Circuit affirmed.

In reaching this conclusion the court of appeals examined the case law cited by the retailer, which includes that cited by Swee-ney, but found all of those cases distinguishable because

> In each instance the guilty manufacturer established either an express resale price or a method to prevent resale to either certain customers or within certain territories. Generally, these policies were imposed upon wholesalers or retailers through a well-defined enforcement scheme.

523 F.2d at 674–75, and Westinghouse had established no such price or method. Like Westinghouse, Texaco did neither of these things.

Indeed, *Westinghouse* presented a more attractive case for denying the defendant's motion for a directed verdict than does this case because at least in *Westinghouse* the court could find that the manufacturer had "discouraged direct competition with one

---

**37.** The manufacturer had offered the plaintiff a very favorable contract as a means of inducing him to distribute its products rather than those of one of the manufacturer's competitors. The contract was designed to meet an offer by one of these competitors. 523 F.2d at 671.

**38.** Sweeney also introduced the opinion testimony of one James P. Rodden, a former Texaco employee who now works for a Sweeney-related entity. (N.T. 389–506). Rodden testified that "[t]o the best of my knowledge I *believe* [that Texaco changed Sweeney's hauling allowance] due to the fact of the retailers and the loss of volume that we encountered through that and their complaints to our management . . . ." (N.T. 457) (emphasis added). However, Rodden's testimony related to 1973, three years after the alleged conspiracy took place. (N.T. 421–22). *See* note 45, *infra.* Whatever possible relevance that testimony may have had on the alleged 1970 and 1971 conspiracies is negated by the rest of his testimony, for Rodden also testified as follows:

By Texaco's counsel to Mr. Rodden:
Q Mr. Rodden, it is correct, isn't it, that you do not have any knowledge of any contract or understanding between Texaco and any person, partnership or corporation outside of Texaco, the purpose of which was to injure, harm or destroy Sweeney's business?

. . . . .

A No.
Q And, isn't it also correct, Mr. Rodden, that you were not aware of any instance where Texaco took any action in its dealings with Sweeney as a result of a contract or understanding between Texaco and any other entity?
A Not that I know of, no.

Q And, Mr. Rodden, as far as you are aware, Texaco did not change or attempt to change Sweeney's point of supply as a result of anything said by any Texaco retailer, isn't that correct?
A That's, I gather that would be correct, yes.
Q That is correct?
A It's correct.

. . . . .

Q Mr. Rodden, are you aware of any instance where Texaco coerced Sweeney or any other Texaco distributor to refrain from dealing with Texaco service stations who engaged in vigorous price competition?
A No, I'm not aware.
Q Not aware of any such instance?
A No.
Q Are you aware of any instance where Texaco increased the price of gasoline to Sweeney or to any other distributor as a result of their contract or understanding with anyone outside Texaco?
A No.

(N.T. 455–461). This testimony makes Sweeney an even weaker case than *Westinghouse,* where there was no indication that the plaintiff's own witness ever made such categorically absolving statements. Indeed Mr. Sweeney, the president of the plaintiff in the instant case testified that Texaco had never interfered with the way Sweeney marketed gasoline or with the method which Sweeney used to arrive at the retail price of Texaco gasoline. (N.T. 379, 382). *See* notes 28–29, *supra.*

other distributor," 523 F.2d at 675, and the record in this case does not permit such a finding. (N.T. 379–82, 389–506). There is absolutely no evidence that Texaco announced a suggested retail price or price range for Texaco gasoline or that it solicited the aid of other retailers in policing its enforcement. (N.T. 461). Indeed, there is no evidence that Texaco tried to influence the retail price of Texaco gasoline in any manner whatsoever. (N.T. 379–382, 455–461). As the court noted in *Carbon Steel,* the retailers who complained were simply following rational market behavior, and their unsolicited activity cannot serve as the basis for finding § 1 liability under even the most favorable reading of *Parke Davis.*

The court's decision in *Butera v. Sun Oil Co., Inc.,* 496 F.2d 434 (1st Cir. 1974), a case strikingly similar to this one, confirms the wisdom of this conclusion. The plaintiff in *Butera* was a retailer of defendant Sun Oil's products. He alleged that a change in Sun Oil's method of computing certain allowances prevented him from taking advantage of fluctuations in the wholesale price of gasoline and thus reduced his profit. Although the plaintiff argued that Sun Oil's action constituted resale price maintenance in violation of § 1 of the Sherman Act, the district court granted Sun Oil's motion for summary judgment and the court of appeals affirmed.

As the court of appeals explained Sun Oil, like Texaco, had not suggested the resale price of the gasoline it supplied to the plaintiff. The court further reasoned that:

> [A] producer's tight control over its wholesale prices does not become resale price maintenance merely because retail outlets to which it sells, being highly competitive and selling at low margins, are sensitive to every change in wholesale prices.
>
> . . . . .
>
> The decision as to what margin to use and when to change it, and consequently what retail price to charge remains But-

era's, and we agree that such economic impact as follows from Sun's tight control of its own wholesale pricing is not a Sherman Act violation.

496 F.2d at 437–38. Therefore the court held that the plaintiff had failed to show that by changing the method of computing the plaintiff's allowance Sun Oil violated § 1 of the Sherman Act.

The facts proven by the plaintiff in *Butera* closely parallel those proven by Sweeney. In both cases the plaintiffs adopted a method of operating which employed their supplier's special allowances to increase their profits. Sweeney used the hauling allowance as a subsidy by acquiring stations near Westville and Butera used the volume allowance as a bonus by speculating on the price of gasoline and filling his oversize tank when he thought that due to fluctuations in the price he would get a larger allowance. In both cases the cost of the product to the plaintiffs was increased when the defendant changed the method of calculating the allowance. If the injury to the plaintiff did not suffice to establish a § 1 violation in *Butera* it cannot suffice here. *Butera* shows that *Colgate* survived *Parke Davis* and that when a manufacturer acts like Texaco, independently and for its own business purposes, it does not violate the Sherman Act. To hold otherwise would be to hold that Texaco had a duty to continue to give Sweeney a hauling allowance solely to provide Sweeney with an advantage over its competitors.[39] That I cannot do.

■ Sweeney has also argued that in light of the Supreme Court's decision in *Albrecht v. Herald Co.,* 390 U.S. 145, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), an agreement between Texaco and the complaining retailers can be established merely because the retailer's complaints helped Texaco effectuate its plan to force Sweeney to raise its prices. Prior to the oral argument on the defendant's motion for a directed verdict Sweeney cited *Fuchs Sugars & Syrups,*

---

**39.** As the *Westinghouse* court noted such a procedure could have exposed Texaco to liability under the Robinson-Patman Act in a suit brought by Sweeney's competitors. 523 F.2d at 676. For a more detailed discussion of this argument see Part VII, *infra.*

*Inc. v. Amstar Corp.,* 447 F.Supp. 867 (S.D. N.Y.1978), as the strongest authority for its position.[40] However, just before the oral argument counsel learned that the Court of Appeals for the Second Circuit had reversed the district court in *Fuchs,* 602 F.2d 1025 (2d Cir. 1979).

The plaintiffs in *Fuchs* were general sugar brokers who sometimes bought sugar from the defendant Amstar. In addition to general brokers, such as plaintiffs, who arranged for sales of sugar from Amstar as well as from Amstar's competitors, Amstar dealt with direct brokers who arranged only for sales of Amstar's products. It was undisputed that the operation of the general brokers reduced the price of Amstar's sugar and therefore lowered Amstar's profit margin. To increase its profit margin Amstar decided to change its system of distribution by ceasing to deal through general brokers. It then gave the general brokers the choice of becoming direct brokers or being terminated. Although some of the former general brokers agreed to become direct brokers the plaintiffs did not.

Relying, like Sweeney, on *Albrecht,* the plaintiffs in *Fuchs* alleged that Amstar's actions resulted from a combination violative of § 1 of the Sherman Act. The jury agreed and returned a verdict for the plaintiffs. Since the district court had refused to grant Amstar's motion for judgment n. o. v., Amstar appealed. The Court of Appeals for the Second Circuit held that the defendant's conduct did not violate § 1 of the Sherman Act and reversed the district court's denial of the defendant's motion for judgment n. o. v.

My decision in this case follows inexorably from *Fuchs.* The court of appeals reversed the district court in *Fuchs* even though the plaintiffs had argued that the "jury . . . could infer that Amstar's goal in terminating its general brokers was anti-competitive and that the conduct of its general and/or direct brokers materially aided and abetted its accomplishment," *Id.* 1031, and that Amstar therefore engaged in a combination or conspiracy. Sweeney could not even make such an argument in this case for Sweeney has not alleged, and indeed could not show, that the complaints of its competitors aided and abetted Texaco's allegedly anti-competitive scheme. In this case there is simply no one in the position of the brokers in *Fuchs* who, like the substitute distributor in *Albrecht,* reaped the benefit of the defendant's allegedly anti-competitive behavior. Both in *Fuchs* and in *Albrecht* third parties entered into agreements which resulted in their receipt of business which might otherwise have gone to the plaintiff. The change in Sweeney's hauling allowance had no such effect, for Sweeney's gallonage continued to increase (Plaintiffs' Exhibit 109) and Sweeney's distributorship was never given to anyone else. If in *Fuchs,* where there was an agreement between the defendant and another entity which received business otherwise given to plaintiff the court did not find that the jury could infer a conspiracy in violation of the Sherman Act, I cannot so find in this case, which lacks even that agreement.[41] The court of appeals has been unwilling to expand "*Albrecht* beyond its narrow factual confines," *Harold Friedman, Inc. v. Kroger Co.,* 581 F.2d 1068, 1074 (3d Cir. 1978), and I believe that it would agree with the *Fuchs* court and refuse to expand *Albrecht* to cover the facts of this case.

**40.** At the conclusion of the first day of trial the court asked counsel for the plaintiff, off the record, what the best authority for his position was. Counsel cited the district court's opinion in *Fuchs* as his best authority. (*See* N.T. 1853 for an on the record discussion of this conversation). The court then expressed its concern over differences in the facts of *Fuchs* and Sweeney which seemed to make *Fuchs* a much stronger case for denial of the defendant's motion for judgment notwithstanding the verdict than was Sweeney. (The standards for deciding motion for directed verdict and judgment notwithstanding the verdict are identical. *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir. 1970)).

**41.** As in *Fuchs,* there is no evidence that any other entity knew that Texaco planned to change Sweeney's hauling allowance. Therefore, as in *Fuchs,* I cannot hold that the jury could infer that any other entity participated in that decision.

As the *Fuchs* court realized, the jury's ability to infer that the defendant had an anticompetitive purpose in taking the action in question is immaterial. As long as Texaco, like Amstar, acted without soliciting the aid of any other entity, as is undisputedly the case here,[42] its motives are irrelevant. As the Court of Appeals for the District of Columbia has held,

> To establish the illegality of [an] act under Section 1, it is not enough to prove that [the defendant's] motivation was that of punishment for discounting or anything else, however reprehensible.

*Dart Drug Corp. v. Parke, Davis & Co.,* 120 U.S.App.D.C. 79, 92, 344 F.2d 173, 186 (1965) (footnote omitted). While such motivation may do violence to the policy behind the Sherman Act it does not without more constitute a violation of that act. *Id.* at 92, 344 F.2d at 186 n. 6.[43] *House of Materials Inc. v. Simplicity Pattern Co.,* 298 F.2d 867 (2d Cir. 1962). *See Mannington Mills, Inc. v. Congoleum Industries, Inc.,* 610 F.2d 1059, 1069 (3d Cir. 1979).

Neither can I find that the hauling agreement, as revised in 1971 to provide for a hauling allowance equivalent to the Macungie to Pottstown rate (Plaintiffs' Exhibit 10), was itself an agreement in restraint of trade violative of § 1. Sweeney raised this theory for the first time in its response to Texaco's motion for a directed verdict. It urged that under the famous footnote 6 in *Parke Davis,* the jury could find that Sweeney and Texaco entered into an unlawful agreement when Sweeney reluctantly accepted the change in the hauling allowance.[44] In further support of this argument Sweeney cites the district court's opinion in *Fuchs,* which made passing reference to the possibility of establishing such a conspiracy. *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 447 F.Supp. 867, 875 (S.D.N.Y.1978), *rev'd* 602 F.2d 1025 (2d Cir. 1979). Notably, the court of appeals did not even discuss this theory.

Sweeney misapprehends the teachings of footnote 6 in *Parke Davis.* In *Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134 (1968), the court expanded on the theory first alluded to in *Parke Davis.* The plaintiffs in *Perma Life,* franchisees of Midas muffler shops, had sued the franchisor for alleged violations of § 1 of the Sherman Act. The franchisees charged that certain tying clauses and other restrictive provisions in the franchise agreement constituted unlawful restraints of trade. The franchisor argued that the franchisees had been willing participants in the agreements and that their claims were barred by the doctrine of *in pari delicto.* The Court, relying on its prior decision in *Parke Davis,* rejected the defendant's argument and held it liable for violating § 1. Two points, though not articulated in the opinion, are crucial to understanding the court's decision.

First, the agreement between the dealer and the franchisor, in so far as it contained tying provisions, was unlawful on its face as a *per se* violation of § 1. *International Salt Co., Inc. v. United States,* 332 U.S. 392,

---

42. Sweeney has never alleged that Texaco sought the aid of Sweeney's competitors to enforce its alleged desire to have Sweeney charge higher prices.

43. *Lehrman v. Gulf Oil Corp.,* 464 F.2d 26 (5th Cir.), *cert. denied,* 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972), does not mandate a contrary result. First, that case involved temporary price allowances, a subject which plaintiffs explicitly withdrew from consideration in this case. (N.T. 1840). Second, unlike Texaco, the defendant in that case had announced suggested retail prices and the court based its decision on that fact.

44. In footnote 6, the Court stated that,
 Indeed, if [the large retailer's] resumed adherence to the Parke Davis price scale after the interview between its vice-president and Parke Davis' assistant branch manager, [p. 510] supra, shows that Parke Davis and [the retailer] entered into a price maintenance agreement, express, tacit or implied, such agreement violated the Sherman Act without regard to any wholesalers' participation.
 362 U.S. at 45, 80 S.Ct. at 512 n. 6. It should be noted that these remarks represent only dicta, since *Parke Davis* was a case brought by the government. The large retailer to which the court referred was not seeking to establish Parke Davis's liability to it on the basis of that agreement.

68 S.Ct. 12, 92 L.Ed. 20 (1947). This made it like the agreement alluded to in footnote 6 of the *Parke Davis*, which in so far as it provided for adherence to predetermined resale prices, would have been unlawful on its face as a *per se* violation of § 1. *Dr. Miles Medical Co. v. Park & Sons Co.,* 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911). *See United States v. Socony-Vacuum Oil Co., Inc.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Second, the Court decided only that the defense of *in pari delicto* would not apply in an antitrust case. It did not decide that an agreement would violate the Sherman Act merely because it was not as economically advantageous to one of the parties as he would wish.

■ After understanding these points it is easy to see why the Supreme ·Court reached the decision it did in *Perma Life* and why that theory does not help Sweeney establish the existence of an unlawful agreement in this case. In neither *Perma Life* nor *Parke Davis* was there any question of the illegality of the agreement. That, however, is the precise issue which I must decide in this case. The Court in those cases was faced with agreements which contained provisions violative of the Sherman Act on their face. I am not. The hauling agreement between Sweeney and Texaco contains nothing which on its face constitutes an agreement in restraint of trade. Only if the agreement resulted from a combination or conspiracy in restraint of trade would it violate § 1. Sweeney cannot establish the existence of the combination or conspiracy by merely establishing the existence of an otherwise lawful agreement. Neither *Parke Davis* nor *Perma Life* can provide the missing link: the evidence of combination or conspiracy. Those cases, together with the district court's opinion in

*Fuchs* would only prevent Texaco from asserting the *in pari delicto* defense. They do not suffice to prove Sweeney's case.

## B. 1971 COMBINATION CONSPIRACY—TERMINATION OF SWEENEY'S DISTRIBUTOR AGREEMENT

### 1. HORIZONTAL AGREEMENT

■ Sweeney alleges that the testimony of one James P. Rodden, a former Texaco employee currently employed by a Sweeney enterprise, establishes the existence of a conspiracy between Texaco and other retailers to terminate Sweeney's distributor agreement.[45] At trial I allowed Sweeney to elicit testimony from Rodden on this subject and denied Texaco's motion to strike. (N.T. 464, 592–96). At oral argument on its motion for a directed verdict Texaco renewed its motion to strike Rodden's testimony and I again, denied it. I continue to stand by that ruling. That Rodden's testimony is admissible does not mean that it is admissible for all purposes however. I, like the jury, must consider testimony only for the purposes admitted. In this case Rodden's testimony of his own opinions, surmises, and hearsay, is admissible only to show Texaco's alleged motives for terminating Sweeney.[46] (*See* N.T. 592–96). However, as the court held in *Dart Drug Corp. v. Parke, Davis & Co.,* 120 U.S. App.D.C. 79, 344 F.2d 173 (1965), and recognized in *Fuchs Sugars & Syrups, Inc. v. Amstar Corp.,* 602 F.2d 1025 (2d Cir. 1979), anticompetitive motivation without more, does not violate the Sherman Act.[47] *See United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).

Rodden's testimony, while admissible, is so speculative on the issue of the relationship between the dealers' complaints and

---

**45.** Rodden's testimony is not relevant to the existence of a conspiracy to reduce Sweeney's hauling allowance. On direct examination Rodden testified that prior to 1973 he was not aware of any discussion regarding the change in Sweeney's hauling allowance. (N.T. 421–22). Even after that time, Rodden was not aware of any occasions on which that was discussed at great length. (N.T. 423).

**46.** I so ruled on several occasions. (*See e. g.* N.T. 413, 415).

**47.** Even if Texaco officials decided to terminate Sweeney because of his pricing practices and discussed the termination amongst themselves, Texaco would not have violated § 1. The plaintiff is not alleging that a corporation can conspire with itself. *See* note 43 and accompanying text, *supra.*

Texaco's actions that no reasonable jury could base a decision on it.[48] Since I would have had to exclude such evidence from the jury's consideration on the issue of conspiracy, *Venzie Corp. v. United States Mineral Products Co., Inc.,* 521 F.2d 1309, 1312 (3d Cir. 1975), *Harlem River Consumers Cooperative, Inc. v. Associated Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1272 (S.D.N.Y. 1976), I cannot use it as the basis for denying Texaco's motion for a directed verdict. *See International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 709 (E.D.Pa.1978), *aff'd* 595 F.2d 1212 (3d Cir. 1979). As the court held in *Harlem River Consumers:*

> [S]peculation and surmise may not support a jury verdict and may not substitute on this motion [for a directed verdict] for evidence of some kind that [the defendant] knowingly participated in any conspiracy which might have existed.

408 F.Supp. at 1272. While the jury could have used Rodden's testimony to corroborate other evidence of a combination or conspiracy, it could not use it as the sole support for its verdict.[49]

Like the plaintiff in *Venzie,* Sweeney

> [H]ad the burden of adducing sufficient evidence from which the jury could conclude, on the basis of reasonable inferences and not on mere speculation, [the] defendants' [actions] were the product of concerted action . . . .

521 F.2d at 1312. As the court of appeals reiterated in *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp., Inc.,* 579 F.2d 20 (3d Cir.) *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), the trial judge may direct a verdict "where such action is necessary to guard against a verdict founded solely on 'mere speculation.'" 579 F.2d at 25. That is precisely what I had to do in this case.

Other than Rodden's testimony Sweeney introduced no evidence with respect to the 1971 conspiracy which it had not already introduced to prove the existence of the 1970 conspiracy. It follows that given the inability of using Rodden's testimony to establish the existence of a conspiracy to terminate Sweeney in 1971, I must find that for the reasons stated in Part V A of this opinion, with respect to the 1970 con-

---

**48.** On cross-examination (by Texaco's counsel) Rodden testified as follows:

Q And, am I correct that it was Texaco's marketing philosophy that Texaco preferred its retailers price to be competitive with other service stations in their immediate area?
A Yes.
Q And, it was Texaco's marketing philosophy that it encouraged interbrand competition?

A Yes.

Q Do you know of any Texaco distributor who became aware of the reasons why Texaco terminated Sweeney, the Sweeney Company's distributor agreement?
A They—we—we don't know the reasons. I don't know the reasons today. We surmised what they thought the reason was. (Following a colloquy between counsel and the court, the reporter read the question and answer back to the witness).
A In the answer which the court reporter has just read back to you, Mr. Rodden, to whom are you referring when you said we surmised?
A I would be referring to myself, the marketing reps that were in the Philadelphia district at that time, the marketing supervisors that were in the district at that time, the assistant district manager and the district manager.
Q All those people surmised the reasons?
A Yes, sir.
Q Including yourself?
A To the best of my knowledge. I don't know of anyone of them that knows the fact or was told the fact why it was canceled, why Texaco took legal action.
Q And, does that include everyone to whom you spoke about the possible reasons for the termination of Sweeney's distributor agreement?
A Yes.
Q You haven't left anybody out?
A I believe I haven't, no.
(N.T. 462–467).

**49.** It was the possibility of Sweeney's using Rodden's testimony as corroboration that led me to admit it in the first place. (*See* N.T. 464–66). I realized the difficulty of proving the existence of a conspiracy and did not wish to put obstacles in Sweeney's already tortuous path. However, deciding to admit the testimony to give Sweeney the benefit of every arrow in its quiver is different from ruling that an arrow that circles the victim can kill, as Sweeney would have me conclude.

spiracy, Sweeney has failed to produce sufficient evidence to allow the jury to conclude that Texaco entered into a combination or conspiracy to terminate Sweeney's distributor agreement in 1971.

## 2. VERTICAL AGREEMENT

 Sweeney has also failed to introduce any additional evidence with respect to the existence of a vertical conspiracy in 1971. Indeed, with respect to this claim Sweeney has introduced evidence which makes the case so like *Fuchs* that my decision in this case follows from the court of appeals' decision in that case as inevitably as night follows day. In *Fuchs* the court of appeals thought it significant that the decision to terminate the general brokers "was a closely guarded secret within the Amstar corporation . . . ." 602 F.2d at 1031. Likewise, according to Rodden, Sweeney's own witness, the decision to terminate Sweeney was a closely guarded secret within Texaco, and those involved in reaching it were forbidden to discuss it with anyone outside Texaco. (N.T. 462–464). Moreover, Rodden testified that he did not know of anyone who had violated that directive (N.T. 463) or of any distributor who became aware of the reasons for the termination. (N.T. 464).

By further contrast to *Fuchs,* where Amstar's decision materially affected other general brokers, Texaco's decision to terminate Sweeney had no effect on the marketing policies of other distributors. (N.T. 467–468). Indeed, Rodden testified that he did not know of "any instance where Texaco coerced Sweeney or any other Texaco distributor to refrain from dealing with Texaco service stations who engaged in vigorous price competition." (N.T. 461). Since the facts of this case are even more compelling than those in *Fuchs,* I have decided to follow the court of appeals' decision in that case.

This decision is supported by sound policy. Although we must give a plaintiff considerable latitude in proving his case due to the difficulties inherent in proving the existence of a conspiracy, we should not do so at the expense of penalizing a defendant who, under current law, has the right to unilaterally alter his practices as he sees fit. *See United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); *Venzie Corp. v. United States Mineral Products Co., Inc.,* 521 F.2d 1309, 1318 (3d Cir. 1975); *George W. Warner & Co. v. Black & Decker Mfg. Co.,* 277 F.2d 787 (2d Cir. 1960). As Professor Areeda has noted, "Once we recognize, however, that many cut-off dealers will harass their former suppliers with treble damage suits we might hesitate to scrutinize too closely the ambiguous refusal to sell that is not clearly employed to attain an end that could not lawfully be attained by direct agreement." *Areeda* Antitrust Analysis, 560 (1974). The Court of Appeals for the Third Circuit has refused to so emasculate *Colgate.* In the case at bar, I have concluded after close scrutiny that the facts proven would not allow a jury to find that Texaco entered into a combination or conspiracy in violation of § 1 of the Sherman Act.

## VI. *SWEENEY'S CLAIM UNDER § 2 OF THE SHERMAN ACT*

Sweeney had also claimed that Texaco conspired and attempted to monopolize the market in Texaco gasoline in violation of § 2 of the Sherman Act.[50] Sweeney has failed to produce any evidence from which a jury could find that Texaco gasoline constitutes a product market for § 2 purposes.[51] Therefore, I directed a verdict in favor of Texaco on both of Sweeney's § 2 claims.

---

**50.** Section 2 of the Sherman Act imposes liability upon

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of trade or commerce among the several States, . . .

15 U.S.C. § 2.

**51.** By letter of May 25, 1979, Sweeney agreed that to succeed on its § 2 claim the court must determine that Texaco gasoline is the relevant market. In this facet of the case Sweeney is not alleging that Texaco attempted to monopolize the market in gasoline generally or that Texaco conspired with other gasoline producers to do so. (*See* N.T. 81–84).

## A. ATTEMPT TO MONOPOLIZE

■ To establish a claim of monopolization or attempted monopolization the plaintiff must show that the defendant intended to acquire or maintain power in a relevant market, that it sought to do this by engaging in exclusionary practices, and in the case of attempt, that it had a dangerous probability of succeeding.[52] *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); *Lorain Journal Co. v. United States,* 342 U.S. 143, 153, 72 S.Ct. 181, 96 L.Ed. 162 (1951); *Swift and Company v. United States,* 196 U.S. 375, 396, 25 S.Ct. 276, 49 L.Ed. 518 (1905); *Coleman Motor Corp. v. Chrysler Corp.,* 525 F.2d 1338, 1348 (3d Cir. 1975); *Telex Corp. v. International Business Machines Corp.,* 510 F.2d 894 (10th Cir.), *cert. dismissed,* 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975).

■ Sweeney has not even established the first element of a § 2 violation. Although it alleged that Texaco gasoline comprises a separate market which Texaco attempted to monopolize, it has failed to introduce any evidence on which a reasonable jury could base a decision in agreement with this contention.

■ Defining the boundary of the relevant product market is the first step in determining whether a defendant has violated § 2. *United States v. Grinell Corp.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. DuPont & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). Without such a determination it would be impossible to ascertain whether a defendant has or has attempted to acquire a monopoly. The problem of defining the market in which the defendant is accused of having or having attempted to obtain a monopoly is rarely an easy one to solve. Nonetheless courts have established some guidelines to aid in its resolution. In *United States v. DuPont & Co.,* 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), the Court stated that:

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that 'part of the trade of commerce,' monopolization of which may be illegal.

351 U.S. 395, 76 S.Ct. at 1007. As the court of appeals explained in *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.,* 579 F.2d 20 (3d Cir. 1978), *cert. denied,* 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978),

> The 'monopoly' condemned by § 2 of the Sherman Act inheres in 'the power to control prices or exclude competition.' To the extent that competition from related products limits the market power of an entity with a dominant position in one product, such an entity is less likely to be found to hold 'monopoly' power forbidden by law. This is so because the ongoing competition from other products guards against the ability of the dominant entity to increase prices and makes exclusionary tactics by such a party fruitless, impossible or unbearably expensive. Thus, in resolving the proportion of the 'market' controlled as a prelude to an examination of the extent of a firm's power to control prices or exclude competition, the courts

**52.** In *Coleman Motor Co. v. Chrysler Corp.,* 525 F.2d 1338, 1348 n. 17 (3d Cir. 1975), the court of appeals held that to establish a claim of attempted monopolization a plaintiff had to show that the defendant possessed sufficient market power to come dangerously close to success. In doing this the court relied on the Supreme Court's opinion in *Swift and Company v. United States,* 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518 (1905), and declined to follow the Court of Appeals for the Ninth Circuit which had held that a plaintiff could establish an attempt to monopolize in violation of § 2 with-

out first establishing that the defendant controlled a particular share of the relevant market. *Greyhound Computer Corp. v. International Business Machines,* 559 F.2d 488, 504 (9th Cir. 1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Lessig v. Tidewater Oil Co.,* 327 F.2d 459, 474–75 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964). *Cf. Mogul v. General Motors Corp.,* 391 F.Supp. 1305 (E.D.Pa.1975), *aff'd* 527 F.2d 645 (3d Cir. 1976) (court noted split of authority on this issue but found that it did not need to resolve it).

look to the range of 'commodities reasonably interchangeable by consumers for the same purposes.'

579 F.2d at 26, *quoting United States v. E. I. DuPont & Co.,* 351 U.S. 377, 391, 395, 76 S.Ct. 994, 100 L.Ed. 1264 (1956) (footnotes omitted). Looking to the range of commodities "reasonably interchangeable by consumers for the same purposes" as Texaco gasoline leads to the inescapable conclusion that Texaco gasoline does not represent a separate market for purposes of § 2. By Sweeney's own admission gasoline is a fungible commodity. Sweeney unhesitatingly bought gasoline from other refiners to sell to its stations. (N.T. 213–225). Through the testimony of its officers Sweeney also admitted that it had to compete with retail stations selling Texaco and other branded as well as unbranded gasoline and with distributors who sold Texaco and other branded as well as unbranded gasoline.[53] (N.T. 364–65, 476, 574–79).

Moreover, Sweeney introduced evidence to show that the price at which it sold Texaco gasoline depended on the price at which other distributors and retailers sold their gasoline. (*Id.*) Had Texaco gasoline been a separate product market, as Sweeney claims, changes in the price of Texaco gasoline would not have resulted in shifts in customer preference. Yet, according to the uncontradicted testimony of Sweeney's own witnesses, that is precisely what they feared and what happened.[54] (N.T. 476, 536–538). As the Court noted in *DuPont,*

> Price and competition are so intimately entwined that any discussion of theory must treat them as one. It is inconceivable that price could be controlled without power over competition or vice versa.

351 U.S. at 392, 76 S.Ct. at 1005. Since it is clear that Texaco did not have control over price it could not have had control over competition. Thus, Sweeney's evidence permits only one conclusion: Texaco gasoline was easily interchangeable with other gasoline and did not constitute a separate product market.

Justice, then Judge, Stevens, reached the same conclusion in a very similar case, *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290 (7th Cir. 1974). The plaintiff in *Mullis* was a distributor of the defendant's products. After Arco terminated his distributor agreement the plaintiff brought an action alleging *inter alia* that Arco had violated § 2 of the Sherman Act. As in this case, the plaintiff needed to establish that the Arco products formed the market which the defendant sought to monopolize. The court, however, refused to find that Arco gasoline was the relevant market and reversed the district court's issuance of an order enjoining the defendant from refusing to supply the plaintiff with Arco products.[55] 502 F.2d at 296–97.

**53.** In *Mullis v. Arco Petroleum Corp.,* 502 F.2d 290, 296 n. 17 (7th Cir. 1974), discussed *infra,* the court found these factors significant. In that case, as in this case, the defendant oil company provided "TVA's" to help dealers faced with competition from other stations. Although Sweeney did not seek damages as a result of disputes over TVA's, (N.T. 81–84) notation of their existence is, as in *Mullis,* appropriate.

**54.** *See* note 70, *infra.* Neither Sweeney nor Texaco introduced expert testimony on this issue of cross-elasticity of demand for Texaco gasoline. The jury would have had to evaluate the testimony of Sweeney's lay witnesses to arrive at a decision, and I must decide whether this testimony taken as a whole would support a verdict in Sweeney's favor. It is for that reason that I must analyze the inferences which reasonable people could have drawn from the evidence presented.

**55.** Sweeney claims *Mullis* has no application to this case because that case arose out of the 1973 gasoline shortage. Sweeney argues that the market definition decided therein could have no bearing on a case such as this, where the effects of a shortage were not in issue. That argument ignores the basis of the court's opinion, however. Before deciding the issue of the effect of the shortage, the court was at pains to point out that it was,

> [F]irst appropriate to identify the reasons why plaintiff's § 2 claim would be manifestly insufficient if there had been no shortage, and then to consider the relevance of the shortage.

502 F.2d at 295. Only after deciding that Arco gasoline did not constitute a relevant market under normal circumstances did the court go on to consider the effect of the shortage. The court nonetheless concluded that an energy shortage with the attendant regulatory controls imposed on oil companies would not justify a

Like Sweeney the plaintiff in *Mullis* had argued that its inability to secure an alternative source of supply compelled the conclusion that the relevant market included only the defendant's products.[56] The court disagreed. It reasoned that,

> The fact that an injury to a particular competitor may be unusually severe is not a justification for adopting a market definition which only considers the particular product line which he has previously sold or purchased. For in Sherman Act litigation we must adhere to the admonition that the statute is concerned 'with the protection of *competition,* not *competitors.*' And whether the competition is more intense on the seller's or the buyer's side of the market, we may not arbitrarily segregate one brand from equally acceptable substitutes in order to protect a particular competitor from injury.

502 F.2d at 298–99, *quoting Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962) (footnote omitted; emphasis in original). Yet such arbitrary segregation is precisely what Sweeney seeks. Like the court in *South End Oil Co. v. Texaco Inc.,* 237 F.Supp. 650 (N.D.Ill. 1965), I cannot hold that a jury could find that Texaco gasoline constitutes a distinct product market.

In *South End* the plaintiff, a Texaco distributor, brought an action against Texaco alleging a violation of § 2 of the Sherman Act. To succeed on its claim the plaintiff had to establish that Texaco motor oil formed a separate market. The court granted summary judgment for the defendant and held that

> As a legal proposition, plaintiff's monopolization argument cannot be sustained. The product market cannot be restricted in the manner in which [plaintiff] suggests, . . . Where commodities are competitive and reasonably interchangeable, the relevant market cannot be confined to the products of one manufacturer.

237 F.Supp. at 655–56 (citation omitted). In this case, as in *South End,* Sweeney's witnesses testified that Texaco gasoline was competitive and interchangeable with other gasoline. In the absence of any evidence of the uniqueness of Texaco gasoline the jury could not have concluded that, contrary to the teachings of *Mullis* and *South End Oil,* Texaco gasoline represents a separate product market.

■ Sweeney has also argued that the existence of the Texaco trademark provides the necessary evidence of the existence of a separate market. This contention is without merit and has been repeatedly rejected. *United States v. E. I. DuPont & Co.,* 351 U.S. at 393, 76 S.Ct. 994; *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301 (9th Cir. 1978); *Merit Motors, Inc. v. Chrysler Corp.,* 417 F.Supp. 263, 269 (D.D.C.1976); *aff'd,* 187 U.S.App.D.C. 11, 569 F.2d 666 (1977); *Mogul v. General Motors Corp.,* 391 F.Supp. 1305, 1313 (E.D.Pa.1975), *aff'd* 527 F.2d 645 (3d Cir. 1976); *ALW, Inc. v. United Air Lines, Inc.,* 510 F.2d 52, 56 (9th Cir. 1975); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 120 (9th Cir. 1972); *Mt. Lebanon Motors, Inc. v. Chrysler Corp.,* 283 F.Supp. 453 (W.D.Pa.1968), *aff'd,* 417 F.2d 622 (3d Cir. 1969); *Packard Motor Car Co. v. Webster Motor Car Co.,* 100 U.S.App.D.C. 161, 163, 243 F.2d 418, 420, *cert. denied,* 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); *Wales Home Remodeling Co., Inc. v. Alside Aluminum Corp.,* 443 F.Supp. 908 (E.D.Wis.1978); *Diehl & Sons, Inc. v. International Harvester Co.,* 426 F.Supp. 110, 120–22 (E.D.N.Y. 1976). *See Columbia Metal Culvert, Inc. v.*

---

redefinition of the relevant market. 502 F.2d at 298. On the contrary, insofar as a shortage increased the "cross-elasticity of demand" the relevant market would tend to increase, not decrease in size. *Id. Consumers Oil Co. v. Continental Oil Co., Inc.,* 1979–1 Trade Cases ¶ 62,596 at 77,434–35 (D.Minn.1979). I will not discuss the effects of a shortage in more detail because Sweeney in its Memorandum in Response to Texaco's Motion for a Directed Verdict stated that "plaintiff has not relied on the fact of shortage in any way concerning its Section 2 count . . . ." at 11.

**56.** In considering this argument the *Mullis* court first evaluated the evidence in the record and then decided whether the existence of an energy crisis would affect that analysis. 502 F.2d at 297.

*Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20, 27, n.11 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

As the Court noted in *DuPont*,

[O]ne can theorize that we have monopolistic competition in every nonstandardized commodity with each manufacturer having power over the price and production of his own product. However, this power that, let us say, automobile or softdrink manufacturers have over their trademarked products is not the power that makes an illegal monopoly. Illegal power must be appraised in terms of the competitive market for the product.

351 U.S. at 393, 76 S.Ct. at 1006 (footnotes omitted). The Court of Appeals for the Third Circuit has followed these teachings. In *Columbia Metal Culvert Co., Inc. v. Kaiser Aluminum & Chemical Corp.*, 579 F.2d 20 (3d Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978), it noted that

The § 2 market definition looks to the existence of competitors as evidence of countervailing power which would preclude monopolization. . . . stifling intra-brand competition may violate § 1, while 'monopoly' over a given brand would *clearly* not run afoul of § 2.

579 F.2d at 27, n.11 (citation omitted) (emphasis added). In the same vein, another court has remarked that

A manufacturer has a 'natural monopoly over his own products, especially when the products are sold under trademark. . . .' *Industrial Building Materials, Inc. v. Interchemical Corp.*, 437 F.2d 1336, 1344 (9th Cir. 1970). See *United States v. E. I. DuPont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

Unless the manufacturer used his natural monopoly to gain control of the relevant market in which his product compete, the antitrust laws are not violated.

*Bushie v. Stenocord Corp.*, 460 F.2d at 120 (9th Cir. 1972).

In light of these holdings and in the absence of any evidence to the contrary I have no choice but to reject Sweeney's argument on the relevance of Texaco's trademark. Indeed, other courts have gone even further and taken judicial notice that the relevant product market cannot be limited to the defendant's trademark. *Mogul v. General Motors Corp.*, 391 F.Supp. 1305, 1313 (E.D.Pa.1975), *aff'd*, 527 F.2d 645 (3d Cir. 1976).[57]

### B. CONSPIRACY TO MONOPOLIZE

■ The evidence introduced to establish a conspiracy to violate § 2 is identical to that which Sweeney introduced to establish a conspiracy to violate § 1. (See Part V, *supra*). Just as that evidence did not suffice to permit the jury to find that such a conspiracy existed, it cannot suffice here.[58] Absent evidence of a conspiracy Sweeney's § 2 claims must fail. See *Mannington Mills, Inc. v. Congoleum Industries, Inc.*, 610 F.2d 1059, 1070 (3d Cir. 1979). Moreover, even if Sweeney succeeded in establishing the existence of a conspiracy, his § 2 claim would fail for failure to show that Texaco gasoline constituted a separate market, and without such a showing no violation of § 2 can occur. *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *United States v. E. I. DuPont & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). (*See* Part VI A, *supra*).

57. In *Mogul* the court held that Cadillac, a brand which was alleged to be specifically associated with luxury automobiles, did not represent a separate market because it was interchangeable with other luxury automobiles as well as less expensive automobiles. Furthermore, the court noted that the Cadillac division of the defendant did not have the power to fix prices. It has not even been contended in this case that Texaco has the power to fix retail gasoline prices and my decision follows *a fortiori* from *Mogul*. Clearly, Texaco gasoline is more interchangeable with other gasoline than Cadillac automobiles are with other automobiles. I could almost take judicial notice of the fact that it would be easier to persuade regular Texaco customers to buy, for example, Exxon instead of Texaco gasoline than to persuade a regular Cadillac customer to drive a Chevette instead of a Cadillac.

58. Ironically, what little evidence Sweeney introduced on this issue supports Texaco's position. (N.T. 462).

## VII. SWEENEY'S CLAIM UNDER § 2 OF THE ROBINSON–PATMAN ACT

Sweeney claims that by changing its hauling allowance to provide for the Macungie to Pottstown rate, Texaco discriminated against it in violation of the Robinson-Patman Act.[59] It seeks damages equal to the difference between the Westville to Pottstown and the Macungie to Pottstown hauling allowance.[60] However, neither Sweeney nor any other Robinson-Patman plaintiff can recover damages on such a theory.

 To succeed on a Robinson-Patman claim a plaintiff must prove at least four things. First, he must prove that there was a difference in the price charged him and his competitors for a particular item at a particular time.[61] Second he must prove that at least one of the purchases involved occurred in commerce.[62] Third, he

---

**59.** Section 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), provides in part,

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States . . . and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: . . .

**60.** Sweeney seems to have asserted this as its measure of damages in its latest submission to the court. Thus, in its Response to Defendant Texaco, Inc.'s Motion for a Directed Verdict Sweeney states that,

> The hauling allowance differential, that is, between Sweeney's old rate and new rate, is greater than the difference between his hauling allowance and of [sic] his competitors' hauling allowances. However, since Sweeney was forced to absorb the loss in order to meet the competition, it accurately *includes the* discriminated amount. . . .
>
> Plaintiff has demonstrated *damage* which *includes* the differential between the favored wholesalers price and his price. Therefore, he should be entitled to recover the damages based on the difference.

At 19–20 (emphasis added). It is extremely unclear from this language which difference Sweeney is seeking damages for. However, since Sweeney refers to a sum of damages which *includes* another, I assume that it seeks damages based on the larger sum. The issue is complicated by Sweeney's representation on the first day of trial that it was changing its damage theory and now claimed damages for the difference between its hauling allowance and that of its competitors. (N.T. 63–81, 332–340). This unnecessary equivocation demonstrates some of the difficulties presented by plaintiff's lack of certainty about the content of its allegations. However, it is irrelevant to the outcome of the case, since Sweeney has failed to provide sufficient evidence to sustain an award of damages based on either measure. *See* note 66, *infra.*

**61.** An issue that arises in the context of this requirement is the appropriate definition of price. Thus, functional discounts do not comprise part of the price for Robinson-Patman Act purposes, and differences in them are not forbidden by § 2(a). *McCaskill v. Texaco Inc.*, 351 F.Supp. 1332, 1340 (S.D.Ala.1972), *aff'd*, 486 F.2d 1400 (5th Cir. 1973); *Refrigeration Engineering Corp. v. Frick Co.*, 370 F.Supp. 702, 713 (W.D.Tex.1974); *Report of The Attorney General's Committee to Study the Antitrust Laws*, 202–04 (1955). Texaco has claimed that the hauling allowance is a functional discount because it represents a payment for services rendered. Since it is undisputed that excluding the hauling allowance all Texaco distributors in Pennsylvania and New Jersey pay the same price per gallon for Texaco gasoline, Texaco claims that Sweeney has failed to show a difference in price. On the other hand, Sweeney claims that the hauling allowance is not a functional discount because it often bears no relationship to the distance over which the gasoline is hauled. Since there was evidence of instances where Texaco knew of distributors who were not hauling their gasoline to the place upon which their allowance was based, I agree with Sweeney on this issue. (*e. g.* N.T. 1026, 1245). I therefore find that the jury could conclude that the hauling allowance is part of the price for Robinson-Patman Act purposes, *Guyott Co. v. Texaco, Inc.*, 261 F.Supp. 942 (D.Conn.1966), *see Corn Products Refining Co. v. FTC*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945), and that the difference between Sweeney's hauling allowance and that of its competitors constituted discrimination violative of § 2(a) of the Robinson-Patman Act.

**62.** Texaco claims that Sweeney has failed to meet this requirement, which is more stringent than that of the Sherman Act. *Gulf Oil Corp. v. Copp Paving Co.*, 419 U.S. 186, 195, 95 S.Ct.

must prove that the discrimination could injure competition.[63] Fourth, he must prove that he was injured as a result of the discrimination.[64] The jury could find that Sweeney has met all but the fourth requirement.[65]

■ In support of its claim that it was injured as a result of the alleged price discrimination Sweeney cites *Fowler Manufacturing Co. v. Gorlick*, 415 F.2d 1248 (9th Cir. 1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970). In *Fowler* the court of appeals held that the amount of the discrimination can serve as the basis and measure of damages under the Robinson-Patman Act. Sweeney therefore argues that it needs to do nothing more than establish the discrimination to succeed on this claim.[66] After reviewing *Fowler* and cases decided before and after it, I find that it does not represent the law of this circuit and probably would not represent the law of the Ninth Circuit today.

As Texaco points out, the *Fowler* court based its decision on *Elizabeth Arden Sales Corp. v. Gus Blas Co.*, 150 F.2d 988 (8th Cir.), *cert. denied*, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945), a case which the very

court which decided it later limited and refused to follow. *American Can Co. v. Russellville Canning Co.*, 191 F.2d 38, 54, 60 (8th Cir. 1951). Moreover, *Fowler* appears to contravene the principles announced by the Supreme Court in cases decided after it. Thus in *Perkins v. Standard Oil Co.*, 395 U.S. 642, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969), a case brought by a distributor against his supplier, the Court held that

Before an injured party can recover damages under the Act, he must, of course, be able to show a causal connection between the price discrimination in violation of the Act and the injury suffered.

395 U.S. at 648, 89 S.Ct. 1871 at 1874. To hold as the court did in *Fowler* that a plaintiff need only prove discrimination, would run afoul of the Court's directive to require proof of a connection between the discrimination and the injury. For purposes of this motion I am assuming that Sweeney has proven discrimination,[67] but Sweeney has introduced absolutely no evidence of injury.

More recently, in *Brunswick Corp. v. Pueblo Bowl–O–Mat Inc.*, 429 U.S. 477, 97

---

392, 42 L.Ed.2d 378 (1974). However, the resolution of that issue involves disputed questions of fact which should be decided by a jury. Therefore, for purposes of deciding Texaco's motion for a directed verdict I will assume that a jury would find that Sweeney is correct on this issue and that it has met the jurisdictional requirement of § 2(a).

**63.** There is no serious question that Sweeney has produced sufficient evidence to allow a jury to find that it has met this requirement. As the largest Texaco distributor in the area Sweeney's price increases could allow other distributors to do likewise. Such a result could injure competition.

**64.** The circuits appear to be divided on the interpretation of this requirement. *Compare e. g. Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457 (2d Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), with *Fowler Mfg. Co. v. Gorlick*, 415 F.2d 1248 (9th Cir. 1969), *cert. denied*, 396 U.S. 1012, 90 S.Ct. 571, 24 L.Ed.2d 503 (1970). The effect of this split will be more fully discussed *infra*.

**65.** *See* notes 61–63, *supra*.

**66.** However, even if Sweeney were correct in its assertion that *Fowler* sets forth the standard applicable to this case, it is not clear that the difference between the Westville to Pottstown and the Macungie to Pottstown rates would be the proper measure. Sweeney has charged Texaco with giving Sweeney's competitors a larger hauling allowance than Texaco has given Sweeney. Even if this were true it does not follow that to put Sweeney and its competitors on a parity Texaco would have to pay Sweeney the Westville to Pottstown rate. Indeed, payment to Sweeney of the Westville to Pottstown rate might itself violate the Robinson-Patman Act by giving Sweeney an undue advantage over its competitors. Thus it appears to me that even under *Fowler* Sweeney could recover, at most, the difference between the Macungie to Pottstown hauling allowance and the hauling allowance given its competitors, as it claimed prior to filing its response to Texaco's motion for a directed verdict. (N.T. 63, 332–340). *See* note 60, *supra*. Since I have decided that *Fowler* does not represent the law of this circuit, however, I do not need to decide this issue. See notes 21 and 60 *supra*.

**67.** *See* note 65 and accompanying text, *supra*.

S.Ct. 690, 50 L.Ed.2d 701 (1977), a case brought pursuant to § 7 of the Clayton Act, 15 U.S.C. § 18, the Court affirmed and even expanded the principles which it had announced in *Perkins*. In *Brunswick* the Court held that to recover,

> Plaintiffs must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). As one commentator has noted, *Brunswick* shows

> [T]hat cognizable injury in a section 2(a) case is to be traced *not* to the higher price paid by the plaintiff (the overcharge)— since the infraction is a price *difference* and all the law requires of the seller is a parity in pricing—but rather to the *undercharge* to plaintiff's competitor . . . It is the harm from the discrimination, that is, the undercharge and not from the overcharge which constitutes antitrust injury in the *Brunswick* sense. (emphasis in original).

Handler, *Changing Trends In Antitrust Doctrines: An Unprecedented Supreme Court Term—1977*, 77 Colum.L.Rev. 979, 993 (1977). Texaco has therefore taken the position that *Enterprise Industries, Inc. v. Texas Co.*, 240 F.2d 457 (2d Cir.), *cert. denied*, 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), not *Fowler*, defines the measure of damages applicable to this case.

In *Enterprise* the plaintiff, a gasoline station operator, brought an action against its supplier alleging that the rebates which the supplier had given plaintiff's competitors during a price war were larger than the rebates which the defendant had given plaintiff. The district court accepted the difference between the price charged plaintiff and the lowest price charged any of his competitors as the appropriate measure of plaintiff's damages.[68] That is precisely

what Sweeney would have this court do. The court of appeals, however, reversed the district court's award of treble damages to the plaintiff and dismissed the complaint. The court, in an opinion written by Judge Learned Hand, reasoned that

> [E]ven though we were to agree that the finding was right, and that for that reason the plaintiff had proved its claim for relief, we do not think that it proved the amount of its damages, or indeed that it suffered any damages at all. . . .
> [Plaintiff's] gross loss was the profit on any sales that it would have made to [its] competitors' customers whom it could and would, have retained, had it been able to buy from the defendant at the same price as the competitors.

240 F.2d at 458. The *Enterprise* court analyzed both prior Supreme Court cases and the legislative history of § 2(a) to arrive at this formulation. The court thus reviewed the Court's opinion in *Bruce's Juices, Inc. v. American Can Co.*, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), and finding it distinguishable chose to rely on *Interstate Commerce Commission v. United States*, 289 U.S. 385, 53 S.Ct. 607, 77 L.Ed. 1273 (1933), instead.

As Judge Hand explained, in *Interstate Commerce Commission*, a case which did not purport to construe the Robinson-Patman Act, Justice Cardozo had noted that

> When discrimination and that alone is the gist of the offense, the difference between one rate and another is not the measure of the damages suffered by the shipper. . . .
> Overcharge and discrimination have very different consequences, and must be kept distinct in thought. When the rate exacted of a shipper is excessive or unreasonable in and of itself, irrespective of the rate exacted of competitors, there may be recovery of the overcharge without other evidence of loss. . . . But a different measure of recovery is applicable 'where a party that has paid only the reasonable rate sues upon a discrimi-

---

**68.** The district court had, like the *Fowler* court, relied on *Elizabeth Arden Sales Corp. v. Gus Blass Co.*, 150 F.2d 988 (8th Cir.), *cert. denied*, 326 U.S. 773, 66 S.Ct. 231, 90 L.Ed. 467 (1945).

nation because some other has paid less.' *So. Pac. Co. v. Darnell-Taenzer Co., supra.* Such a one is not to recover as of course a payment reasonable in amount for a service given and accepted. He is to recover the damages that he has suffered, which may be more than the preference or less . . . . The question is not how much better off the complainant would be today if it had paid a lower rate. The question is how much worse off it is because others have paid less.

. . . If by reason of the discrimination, the preferred producers have been able to divert business that would otherwise have gone to the disfavored shipper, damage has resulted to the extent of the diverted profits. If the effect of the discrimination has been to force the shipper to sell at a lowered market price, . . . damage has resulted to the extent of the reduction. But none of these consequences is a necessary inference from discrimination without more.

289 U.S. 389–91, 53 S.Ct. at 609–610 (citations omitted).

The *Enterprise* court further noted that although the Robinson-Patman Act contained a provision which would have made the amount of the discrimination the measure of damages as originally passed by the Senate, that provision was specifically eliminated in conference. 240 F.2d at 460. The court therefore concluded that Congress did not intend that the amount of the discrimination be the measure of damages. Like many other courts, I agree.[69]

Courts in this district have applied the *Enterprise* doctrine and received the approval of the Court of Appeals for the Third Circuit even though that court has not explicitly ruled on the issue. Thus in *Freedman v. Philadelphia Terminals Auction Co.*, 197 F.Supp. 849 (E.D.Pa.1961), aff'd 301 F.2d 830 (3d Cir.), cert. denied, 371 U.S. 829, 83 S.Ct. 40, 9 L.Ed.2d 67 (1962), a case brought pursuant to § 2(c) of the Robinson-Patman Act, Judge Van Dusen relied on *Enterprise* and the legislative history of § 2(a) to conclude that

> Plaintiffs had no automatic right to recover the terminal charges without proof of loss, even if a violation of the Robinson-Patman Act had been found to have existed.

197 F.Supp. at 852. The judge then denied the plaintiff's motion for judgment notwithstanding the verdict and new trial. The court of appeals affirmed.

More recently Judge Huyett, in *Kelly v. General Motors Corp.*, 425 F.Supp. 13 (E.D.Pa.1976), relied on *Enterprise* to "reject the suggestion by plaintiff that his damages will be the amount of the price difference." 425 F.Supp. at 20. That the issue of damages arose in the context of a class certification motion does not diminish the importance of the court's resolution of it. Indeed, the difficulty of ascertaining damages under *Enterprise* was one of the reasons for the court's refusal to certify a class. *Id.* Since there is no evidence of how many customers Sweeney lost to competitors as a result of the alleged discrimination, as required by *Enterprise*,[70] Swee-

**69.** Courts in the Fourth, Fifth, Sixth, and Tenth Circuits have followed *Enterprise. Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 782 (10th Cir. 1964); *Dantzler v. Dictograph Products, Inc.*, 309 F.2d 326 (4th Cir. 1962), cert. denied, 372 U.S. 970, 83 S.Ct. 1097, 10 L.Ed.2d 133 (1963); *Kidd v. Esso Standard Oil Co.*, 295 F.2d 497 (6th Cir. 1961); *Alexander v. Texas Co.*, 165 F.Supp. 53 (W.D.La.1958); *Lombino & Sons, Inc. v. Standard Fruit & Steamship Co.*, 1975–2 Trade Cases ¶ 60,527 at 67,329 (S.D.N.Y.1975); *Krieger v. Texaco Inc.*, 373 F.Supp. 108, 112–13 (W.D.N.Y.1972); *McCaskill v. Texaco Inc.*, 351 F.Supp. 1332, 1341 (S.D.Ala.1972), aff'd, 486 F.2d 1400 (5th Cir. 1973). Courts in the Second Circuit continue to adhere to it. *John B. Hull, Inc. v. Waterbury Petroleum Products, Inc.*, 588 F.2d 24 (2d Cir. 1978), cert. denied, 440 U.S. 960, 99 S.Ct. 1502, 59 L.Ed.2d 773 (1979); *Uniroyal, Inc. v. Jetco Auto Service, Inc.*, 461 F.Supp. 350 (S.D.N.Y.1978). Indeed, of the circuits that have ruled on the issue only the Ninth Circuit has adopted a rule at variance with that of *Enterprise.* (But note that *Fowler* was decided more than ten years before *Enterprise*).

**70.** Although there was some testimony to the effect that Mission Oil Co. and Petroleum Products Co., two of the plaintiffs in this case, bought from Grace Oil, one of Sweeney's competitors, on occasion because Grace could give them a better price than Sweeney could, (N.T.

ney has failed to provide a basis upon which the jury could determine the extent of injury, if any, which Sweeney suffered as a result of any price discrimination in which Texaco may have engaged.

■ Sweeney claims, however, that the *Enterprise* court, relying on *Bruce's Juices, Inc. v. American Can Co.,* 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947), excepted from its own rule cases where the plaintiff absorbed the amount of the discrimination and did not pass it on to the consumers. Whatever the validity of this exception, there is no reason to apply it here. Sweeney has not produced any evidence from which a reasonable jury could conclude that

Sweeney absorbed the amount of the discrimination, however computed.[71] The only evidence which addressed the issue is simply too vague to serve as the basis for an award of damages.[72]

Due to Sweeney's failure to show any injury as a result of Texaco's alleged violation of § 2(a) of the Robinson-Patman Act or produce any basis on which the jury could compute its alleged damages, there was no need to submit the issue of liability to the jury. *See Enterprise Industries v. Texas Co.,* 240 F.2d 457, 460 (2d Cir.), *cert. denied* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957).

536–538) Sweeney has not asserted those purchases as the basis for its damages, (*see* Plaintiff's Response to Defendant Texaco, Inc.'s, Motion for a Directed Verdict, at 17), perhaps because to do so would make it impossible for Sweeney to argue that it absorbed the increase in the hauling allowance, as it has sought to do. *See* note 72, *infra*. Nevertheless, such testimony is so general and inconclusive as to be incapable of forming the basis for a jury determination of the amount of Sweeney's damages. Therefore, such testimony does not suffice to allow the jury to establish the existence of an injury as required by the *Enterprise* doctrine.

**71.** See note 66 *supra* for a discussion of the difficulties with Sweeney's measure of the price discrimination to which it claims to have been subjected. *See also,* note 70, *supra*.

**72.** The only evidence which Sweeney cites in support of the applicability of the *Bruce's Juices* exception is the following testimony of Mr. Sweeney.

By plaintiff's counsel:
Q And, what, if any, effect did that change have on Sweeney's business or profitability?
A Increased my cost by the amount of points that the freight rate was decreased.
Q Did that have an effect on the profitability of Sweeney?
A Yes.
Q What was the effect?
A It reduced the profit Sweeney was making at the various locations.
Q By what amount?
A By the amount of freight rate that was decreased.
Q Why was that?
A Why was that. Because it increased our costs by that amount of money.
(N.T. 191, *See* Plaintiffs' Response to Defendant Texaco, Inc.'s Motion for a Directed Verdict at the Close of Plaintiffs' Evidence at 19). It does not follow from this testimony that Swee-

ney absorbed the increase in the freight rate. First, the increase in the hauling allowance may have raised costs because it resulted in increased prices and reduced volume. (*But see* Plaintiffs' Exhibit 109). Second, there was testimony to the effect that two of Sweeney's customers bought from one of Sweeney's competitors on occasion because that competitor could give them a better price. (N.T. 536–538). *See* note 70, *supra*. This can only suggest that Sweeney did indeed pass on some of the increase. The jury would have had absolutely no evidence from which it could ascertain what portion of the increase Sweeney absorbed. A verdict, particularly in a case of this magnitude, cannot be founded on the unsupported generalizations of an individual who can make no claims to knowledge of the specific financial condition of a business in which he is no longer an active participant. To hold that by making conclusory, unsubstantiated statements about the economic effect of the defendant's actions a plaintiff can establish that it absorbed any price increase and thus comes within the *Bruce's Juices* exception would emasculate the *Enterprise* doctrine. It would make it possible for any plaintiff to say the magic words and have his case submitted to the jury. That would amount to overruling *Enterprise* and the cases in which courts have followed it. Absent some indication that the court of appeals wishes to adopt *Fowler* as the law of this circuit, I will not do so. A litigant should not be permitted to accomplish indirectly (by making bald unsupported allegations designed to bring him within the *Bruce's Juices* exception) what he could not accomplish directly (receive the amount of the discrimination as his damages). As long as *Enterprise* is the law of this circuit a plaintiff must show a specific, competitor by competitor breakdown of the damages he has incurred as a result of the alleged discrimination before he can recover. Sweeney has clearly failed to do that in this case. *See* note 24, *supra*.

## VIII. *TEXACO'S FIRST AND SECOND COUNTERCLAIMS AGAINST SWEENEY*

 Texaco has asserted two counterclaims against Sweeney which the parties agreed to submit to the court for decision based on their written briefs. (N.T. 1863, 1867, 1891). Texaco claims that Sweeney commingled Texaco gasoline with non-Texaco gasoline, sold non-Texaco gasoline and diesel fuel as Texaco gasoline and diesel fuel, and used Texaco marked trucks to deliver non-Texaco gasoline. According to Texaco these actions violated Sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a),[73] Section 1 of the New Jersey Fair Sales Act, N.J.Stat. Ann. § 56:41–1 (West),[74] Section 2(g) of the New Jersey Unfair Motor Fuels Practices Act, N.J.Stat.Ann. § 56:6–2(g),[75] the common law of unfair competition, and constitute a breach of Sweeney's distributor agreement.[76] (Plaintiffs' Exhibit 4).[77] Af-

73. Section 32(1) of the Lanham Act provides:

Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. 15 U.S.C. § 1114(1).

Section 43(a) of the Lanham Act provides:

Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

15 U.S.C. § 1125(a).

74. Section 1 of the New Jersey Fair Sales Act provides:

No merchant, firm or corporation shall appropriate for his or their own use a name, brand, trade-mark, reputation or good will of any matter in whose product such merchant, firm or corporation deals.

N.J.Stat.Ann. 56:4–1.

75. Section 2(g) of the New Jersey Unfair Motor Fuel Practices Act provides that:

All above-ground equipment for storing or dispensing motor fuel operated by a retail dealer shall bear, in a conspicuous place, the name or trade-mark of the product stored therein or dispensed therefrom, and no retail dealer shall permit delivery into underground or aboveground containers, tanks or equipment any motor fuel other than the brand represented or designated by the name or trade-mark appearing on such container or dispensing equipment attached thereto. No retail dealer shall be a party to the substitution of one grade of motor fuel for another. N.J.Stat.Ann. 56:6–2(g).

76. This court has jurisdiction of Texaco's state law claims because the parties are of diverse citizenship (Texaco is a Delaware corporation with its principal place of business in New York, Sweeney is a Pennsylvania corporation with its principal place of business in Pennsylvania, Mission is a New Jersey corporation with its principal place of business in New Jersey, and Petroleum is a partnership none of whose partners are citizens of either Delaware or New York) and the amount in controversy, even if measured by the value of Texaco's claims for injunctive and declaratory relief, exceeds $10,000. Even if this were not the case this court would have jurisdiction over the state law claims pursuant to the doctrine of pendent jurisdiction; the facts involved in the state and Lanham Act claims not only arose from a common nucleus but are indeed identical. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

77. The distributor agreement expressly provided that Sweeney "shall not sell products purchased from others under the trademarks or

ter the court directed a verdict for Texaco, Texaco withdrew its claim for damages on its counterclaim and, through its counsel, stated that it would seek only injunctive and declaratory relief.[78] (N.T. 1864).

## A. LIABILITY

▮▮▮▮ After the court ruled on Texaco's motion for a directed verdict the parties agreed to submit the issues presented

brands of [Texaco] and shall not mix [Texaco's] products one with another or mix or adulterate [Texaco's] products with those of others." (Plaintiffs' Exhibit 4, page 4). Nevertheless, Sweeney argues that Texaco has waived any breaches by Sweeney because it has continued to supply Sweeney until the present time. An examination of the facts reveals the absence of any merit in that argument. Thus, Texaco objected to the breach and in 1971 terminated Sweeney's 1963 distributor agreement as a result of it. (See notes 13 and 20 and accompanying text, supra). Texaco never reinstated that distributor agreement. The agreement pursuant to which Texaco continued to supply Sweeney after 1971 was an informal agreement which provided that Texaco could cease to supply Sweeney upon ten days' notice. (Defendant's Exhibit 68A; see note 13 and accompanying text, supra). Since 1973 Texaco has had no choice but to supply Sweeney pursuant to federal regulations, and in any event, claims (without dispute from Sweeney) that it did not know of the violations until the advent of discovery in this litigation. The record clearly shows that after it learned of Sweeney's breach Texaco attempted to resolve the matters without resorting to litigation. Id. It would be a perversion of the policy of encouraging litigants to resolve their differences amicably for me to hold that unsuccessful attempts at a friendly resolution extinguish the underlying claims. I will not so hold.

**78.** Texaco had previously agreed to limit its damage claim to the amount of any judgment entered against it upon Sweeney's antitrust claims. See note 20, supra. Since Texaco originally sought damages Sweeney's argument that Texaco's failure to seek damages vitiates its breach of contract claim is totally without merit. To succeed on its claim as presently before this court Texaco needs to show that a breach occurred and that continuation of that breach will result in harm to it. Whether Texaco wishes to receive compensation for any damage already incurred as a result of that breach is irrelevant to its entitlement to prospective relief. The courts will not encourage the sort of greediness and litigiousness which acceptance of Sweeney's position would foster.

by Texaco's counterclaims to the court.[79] At that time, faced with its client's own admissions of comingling (N.T. 203–225), and uncontroverted evidence introduced by Texaco, (Defendant's Exhibits 55, 435A–K) Sweeney agreed that the only issue remaining for the court's decision was whether Sweeney's breach of contract or Lanham Act violations were excused by like conduct on the part of Texaco. (N.T. 1872–73, 1890–91).[80] Sweeney thus took the position

**79.** Since this issue has been submitted to the court for decision (N.T. 1890–91), I sit as the trier of fact, unlike my role in deciding Texaco's motion for a directed verdict. I only need to find that Texaco, who has the burden of proving its counterclaims, has indeed proved them by a preponderance of the evidence.

**80.** After the court granted Texaco's motion for a directed verdict on Sweeney's antitrust claims, the following colloquy took place between the court and counsel for Sweeney:

THE COURT: It is pretty clear that the Sweeney Company breached its contract and admits in effect.

MR. KRAMER: Sweeney never denied that it sold.

THE COURT: The question is is it excused because of comingling by Texaco?

MR. KRAMER: That's right.

. . . . .

THE COURT: . . . The posture of the case is that there's an admitted breach of contract or an admitted Lanham Act violation by Sweeney, and the question is, is it excused by like conduct on the part of Texaco, is that right?

MR. KAPUSTIN: Or under the breach of contract claim [against Texaco] or any other reason that's available for excuse of breach of contract.

(N.T. 1872–1890). Sweeney appears to have changed its position and now seems to argue that there is no evidence of a breach on its part. (See Plaintiff's Memorandum in Opposition to Texaco's Second and Third (sic) Counterclaims). The record is overwhelmingly against Sweeney on this issue. (See e. g., N.T. 202–25, 299–320, 1434, 1557–81, 1594–96, 1740–75; Plaintiffs' Exhibits 61, 64, 65, 66, 72, 78; Defendant's Exhibits 75, 435a–435k, 432a, 436b, 440). Therefore, I will not belabor the reasons for which I find that even if Sweeney does not admit to having breached its distributor agreement with Texaco or violated the Lanham Act, it is the ruling of this court that Sweeney's actions did indeed constitute a breach of its distributor agreement with Texaco and a violation of §§ 32(1) and 43(a) of the Lanham Act, § 1 of the New Jersey Fair Sales Act, § 2(g) of

that the record showed that Texaco had purchased gasoline from other refiners which it then sold to Sweeney as Texaco gasoline. Since Texaco acted *in pari delicto,* Sweeney maintains it is not entitled to relief for Sweeney's violations.

■ Sweeney's argument is without merit. Texaco agreed to provide Sweeney with Texaco branded gasoline, and that is precisely what it did. Just what constitutes Texaco branded gasoline is a matter for Texaco in its discretion to determine.

Courts have long recognized that a manufacturer need not itself manufacture every product to which it attaches its trademark. As the Supreme Court explained in *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888),

> The fact that Holt & Co. were not the actual manufacturers of the flour upon which they had for years placed the brand in question does not deprive them of the right to be protected in the use of that brand as a trade-mark.

> They used the words 'La Favorita' to designate flour selected by them, in the exercise of their best judgment, as equal to a certain standard. The brand did not indicate by whom the flour was manufactured, but it did indicate the origin of its selection and classification. It was equivalent to the signature of Holt & Co. to a certificate that the flour was the genuine article which had been determined by them to possess a certain degree of excel-

lence. It did not, of course, in itself indicate quality, for it was merely a fancy name, and in a foreign language, but it evidenced that the skill, knowledge, and judgment of Holt & Co. had been exercised in ascertaining that the particular flour so marked was possessed of a merit rendered definite by their examination, and of uniformity rendered certain by their selection.

128 U.S. at 520, 9 S.Ct. at 143–144. Courts have continued to follow this reasoning.

In *Victor Tool & Machine Corp. v. Sun Control Awnings, Inc.,* 299 F.Supp. 868 (E.D.Mich.1968), *aff'd* 411 F.2d 792 (6th Cir. 1969), the court noted that,

> The use of a trademark, however, does not necessarily and as a matter of law impart that the articles on which it is used are manufactured by its user. It is enough that they are manufactured for him, that he controls their production, or that they pass through his hands in the course of trade and that he gives to them the benefit of his reputation or of his name and business style. *Feather Combs, Inc. v. Solo Products Corp.,* 2d Cir., 306 F.2d 251, cert. den. 371 U.S. 910, 83 S.Ct. 253, 9 L.Ed.2d 170 (1962).

299 F.Supp. at 874.

■ Thus, the validity of Texaco's position does not depend on whether the gasoline it bought from other refiners contained additives or not.[81] Clearly, Texaco had the

the New Jersey Unfair Motor Fuel Practices Act, and the common law of unfair competition. *See, Freed Oil Co. v. Quaker State Oil Refining Corp.,* 419 F.Supp. 479, 493 (W.D.Pa. 1976); *Villager, Inc. v. Dial Shoe Co.,* 256 F.Supp. 694, 700–703 (E.D.Pa.1966), on the § 32(1) Lanham Act violations; *Boston Professional Hockey Ass'n, Inc. v. Dallas Cap & Emblem Mfg., Inc.,* 510 F.2d 1004, 1012–13 (5th Cir.), *cert. denied,* 423 U.S. 868, 96 S.Ct. 132, 46 L.Ed.2d 98 (1975); *Freed Oil, supra; International Election Systems Corp. v. Shoup,* 452 F.Supp. 684, 712–13 (E.D.Pa.1978), *aff'd* 595 F.2d 1212 (3d Cir. 1979), on the § 43(a) Lanham Act violations; *Merrell-National Laboratories, Inc. v. Zenith Laboratories, Inc.,* 194 U.S.P.Q. 157 (D.N.J.1977); *Clairol Inc. v. Cosmetics Plus,* 130 N.J.Super. 81, 325 A.2d 505 (Chanc. Div.1974), on the § 1 New Jersey Fair Sales Act violations; and *Surgical Supply Service, Inc. v.*

*Adler,* 321 F.2d 536, 539 (3d Cir. 1963); *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 439 F.Supp. 1022, 1034–37, 1039–40 (D.Del.1977), *rev'd on other grounds,* 589 F.2d 1225 (3d Cir. 1978); *Freed Oil Co. v. Quaker State Oil Refining Corp.,* 419 F.Supp. 479, 493 (W.D.Pa.1976). Note that contrary to Sweeney's assertions, pursuant to N.J.Stat.Ann. § 56:6–25, actions to restrain violation of § 2(g) are not limited to suits against retail dealers.

81. There is some controversy over whether Texaco added "Petrox" to gasoline it bought from other refiners but marketed under the Texaco brand. *Compare* N.T. 704–706; 1572–75 with N.T. 226–28, 443–36. Although I find that the weight of the credible evidence establishes that Texaco did add Petrox to the gasoline it so purchased, this finding is irrelevant to my conclusion on the validity of Sweeney's

right to put its trademark on whatever gasoline it deemed suitable. The crucial point, which apparently escapes Sweeney, is that just because Texaco, the owner of the trademark, could decide what gasoline to market under that trademark does not mean that Sweeney, who had only the right to sell gasoline so marked, had a like right to decide which gasoline to call Texaco. Any perceived unfairness in this disparity evaporates with the realization that it is precisely what the trademark laws are supposed to accomplish. Indeed, if anyone could decide what goods to market under a given trademark, the value of that trademark and therefore its identity as a trademark would disappear. This is truly a case where what is good for the goose is not good for the gander—that Texaco could and did lawfully decide what gasoline to sell under its trademark does not change the illegality of the same actions when done by Sweeney. It is Texaco's trademark, not Sweeney's.

Other courts have agreed with this proposition. Thus, in *Blue Bell Co. v. Frontier Refining Co.,* 213 F.2d 354 (10th Cir. 1954), an oil company (Frontier) had brought an action against a wholesaler and retailer (Blue Bell) to enjoin and recover damages for the wholesaler's alleged trademark infringement. Interestingly, the wholesaler asserted counterclaims against Frontier claiming that Frontier's actions violated §§ 1 and 2 of the Sherman Act. The district court entered judgment on the jury's verdict for Frontier and the court of appeals affirmed. By so doing it implicitly rejected the argument which Sweeney now makes in this case: in *Blue Bell* the wholesaler picked up gasoline at terminals of other refiners, with whom Frontier had an exchange agreement. 213 F.2d at 356–57. Nevertheless, the court found Frontier's trademark valid [82] and Blue Bell's practice of picking up gasoline from refiners other

than those designated by Frontier's exchange agreement and selling that gasoline under the Frontier trademark to constitute an infringement of that trademark.

In *Redd v. Shell Oil Co.,* 524 F.2d 1054 (10th Cir. 1975), *cert. denied* 425 U.S. 912, 96 S.Ct. 1508, 47 L.Ed.2d 762 (1976), the court affirmed this proposition by reversing the district court's entry of summary judgment on Shell's claims under the Lanham Act. Although the evidence established that Shell obtained much of the gasoline it sold in the area from another refiner, the court noted that the Shell trademark represented that "the gasoline was Shell gasoline and thus either made by or for Shell," 524 F.2d at 1057. This gave Shell the right to insist that only gasoline to which *it* affixed the Shell trademark be sold under that trademark. *Id.*

There can be no doubt that both the precepts followed by courts since 1888 as well as sound public policy decree that Texaco's purchase of gasoline from other refiners does not constitute a breach of Sweeney's distributor agreement and does not excuse Sweeney's own violation of that agreement and the various state and federal statutes governing the use of trademarks. Texaco agreed to sell Texaco branded gasoline to Sweeney. Knowing the value of selling a trademarked product Sweeney converted its stations from unbranded to Texaco branded stations. (N.T. 120–146). (*See e. g.* Plaintiffs' Exhibit 7). This enabled those stations to sell Texaco gasoline at prices higher than those charged for unbranded gasoline. (N.T. 127–133). As Mr. Sweeney testified, the ability to use the Texaco trademark was "the heart of [Sweeney's] marketing program." (N.T. 225). Sweeney reaped the benefits of using the Texaco trademark; it cannot now abdicate its responsibilities.

---

defense; the law gives Texaco, as the owner of a trademark, the right to decide what products to market under its trademark irrespective of whether it takes any action beyond selecting them. *Menendez v. Holt,* 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888).

**82.** Sweeney does not challenge the validity of Texaco's trademark. *See* Defendant's Exhibits 44–49.

## B. RELIEF

Despite Sweeney's arguments to the contrary, Texaco is entitled to both injunctive and declaratory relief.

### 1. DECLARATORY RELIEF—28 U.S.C. § 2201

■ Sweeney argues that Texaco has failed to show the existence of a case or controversy between the parties. That claim is preposterous. Sweeney and Texaco have been at loggerheads for close to ten years now. Indeed, the only possible justification for Sweeney's argument is that it has been in an adversary position with Texaco for so long that it has forgotten that such is not supposed to be the normal state of affairs. Nevertheless, Sweeney argues that there is no evidence of recent violations. Even if this were correct, and it is not, (N.T. 1594–96), Texaco would still be entitled to a declaratory judgment that Sweeney comingled Texaco gasoline and committed the violations charged in Texaco's first and second counterclaims.

As Texaco has shown, under the Petroleum Marketing Practices Act, 15 U.S.C. § 2801 et seq. at § 102(c)(1), as well as some of the New Jersey statutes pursuant to which Texaco is asserting its counterclaims, if it receives such a judgment, Texaco may be able to take some action to enforce its termination rights under the 1972 agreement pursuant to which it now supplies Sweeney. (Plaintiffs' Exhibit 68A). (*See* note 11 and accompanying text, *supra*). Therefore, far from delaying the impact of this court's ruling or making it moot, as Sweeney claims, (*see* Plaintiff's Memorandum in Opposition to Texaco's Second and Third (sic) Counterclaims, at 9–10) the federal legislation makes the impact of this court's ruling immediate and definitive. This suffices to establish the existence of a present case or controversy. *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Evers v. Dwyer,* 358 U.S. 202, 79 S.Ct. 178, 3 L.Ed.2d 222 (1958); *Altvater v. Freeman,* 319 U.S. 359, 63 S.Ct. 1115, 87 L.Ed. 1450 (1943); *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937). Having shown that it has a present controversy with Sweeney over whether Sweeney's conduct violated the various statutes cited in its first and second counterclaims as well as the common law of unfair competition and Sweeney's distributor agreement, and having shown that Sweeney's conduct did indeed violate those statutes, common law, and its distributor agreement, Texaco has shown that it is entitled to a declaratory judgment to that effect. A judgment will be entered accordingly.

### 2. INJUNCTIVE RELIEF

■ Sweeney claims that this court should not enjoin it from comingling non-Texaco gasoline with Texaco gasoline, selling non-Texaco diesel fuel as Texaco diesel fuel, and delivering non-Texaco gasoline in Texaco branded trucks because there is no evidence that Sweeney will do these things in the future and therefore there is no evidence of present harm or threat of harm to Texaco from Sweeney's conduct. By Sweeney's own admission, the record contains evidence of violations up through 1976, (*see* Plaintiff's Memorandum in Opposition to Texaco's Second and Third (sic) Counterclaims, at 3). This conduct has persisted since at least 1971. Even the filing of this lawsuit in 1974 failed to change Sweeney's practices. To hold that there is no threat of recurrence of a practice which seems to be firmly embedded in the Sweeney organization and which even the threat of termination by Texaco in 1971 did not curb is to taunt reality.

■ Moreover, failure to enter an injunction will harm Texaco more than its entry would harm Sweeney. If Sweeney has indeed ceased to comingle Texaco with non-Texaco gasoline, sell non-Texaco diesel fuel as Texaco diesel fuel, and deliver non-Texaco gasoline in Texaco marked trucks, entry of an order enjoining it from doing

those things will not harm Sweeney.[83] By contrast, if Sweeney continues to engage in those practices, failure to enter such an order would greatly harm Texaco.[84] *See Franklin Mint, Inc. v. Franklin Mint Ltd.,* 331 F.Supp. 827 (E.D.Pa.1971). Under these circumstances I have little difficulty in concluding that Texaco has shown that it will suffer irreparable harm unless this court enjoins Sweeney from engaging in the practices complained of.

### On Injunctive Relief

On August 31, 1979, this court filed a memorandum explaining its reasons for granting the motion of defendant, Texaco, Inc. (Texaco), for a directed verdict and deciding the merits of Texaco's first and second counterclaims against plaintiff Edward J. Sweeney & Sons, Inc. (Sweeney). *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 478 F.Supp. 243 (E.D.Pa.1979) (hereinafter cited as *Sweeney I*). Since that memorandum sets out the facts and history of this litigation in great detail, I will not repeat them here. Rather, as I stated in footnote 17 thereof, I will limit myself to deciding whether the request of plaintiffs Sweeney, Mission Gas Oil Products, Inc. (Mission), and Petroleum Products Company (Petroleum) for injunctive relief pursuant to § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), and § 16 of the Clayton Act, 15 U.S.C. § 26, should be granted.[1] I hold that it should not.

### I. *SWEENEY'S CLAIM FOR INJUNCTIVE RELIEF*

Sweeney takes the position that since this court's grant of Texaco's motion

for a directed verdict on Sweeney's Robinson-Patman claims proceeded from its conclusion that Sweeney had failed to make the requisite showing of injury under *Enterprise Industries Inc. v. Texas Co.,* 240 F.2d 457 (2d Cir.), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957), the court's ruling did not foreclose the grant of injunctive relief. Sweeney is correct. However, whereas in deciding Texaco's motion for a directed verdict the court had to examine the evidence favorable to the plaintiff and could find for the defendant only if it concluded that no reasonable jury could do otherwise, on the issue now before the court a different standard applies. I now sit as a trier of fact and can grant Sweeney's request for an injunction only if I find that it has proved that Texaco violated the Robinson-Patman Act. I find that Sweeney has failed to so prove.

The agreements which Texaco enters into with its distributors in this area all provide that Texaco may either deliver the product to the distributor at its own expense or allow the distributor to pick up the product at whatever point Texaco designates, giving the distributor an allowance for assuming the cost of hauling the product to its bulk plant. (*See* Plaintiffs' Exhibits 4, 5). In all cases this allowance is based on the lowest common carrier rate between the designated Texaco pick up point and the distributor's bulk plant. (*See* Plaintiffs' Exhibit 5). Texaco chooses the pick up point for each distributor based on what is more economically advantageous to Texaco. (N.T. 1289–97). That is rational market behavior because that is precisely

---

**83.** Given the issuance of the declaratory judgment which Texaco seeks, the entry of an injunction will make little difference in Sweeney's position before the applicable regulatory agencies. (*See* Part VIII B.1, *supra*).

**84.** Absent an injunction Texaco would have to start from scratch to bring an entirely different lawsuit to establish its rights, whereas it would only need to file an order to show cause why Sweeney should not be held in contempt if this court has entered an injunction.

**1.** Plaintiffs have stated that this court's grant of Texaco's motion for a directed verdict on

their claims for damages under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, also disposes of their claims for injunctive relief thereunder. *See* Plaintiffs' Memorandum in Support of Their Request for Injunctive Relief, at 1–2. Since plaintiffs are correct in so stating I will simply enter an order denying those claims. At this juncture I need only decide plaintiffs' claims for injunctive relief under § 2 of the Robinson-Patman Act. These claims are, however, based on the same facts as plaintiffs' claims for damages under that section.

what Texaco would do if it delivered the product in its own trucks or contracted to have the product delivered to the distributor's bulk plant. In Sweeney's case Texaco determined that it would be cheaper for Texaco to have Sweeney pick up at Macungie rather than at Westville. (*See* Plaintiffs' Exhibit 39; Defendant's Exhibits 437–438; N.T. 1287–1298, 1365–1378; *Sweeney I* at 256). Texaco therefore changed Sweeney's pick up point and, necessarily, its hauling allowance.[2] Sweeney's competitors had their bulk plants at different locations and Texaco did not change their hauling allowances. These actions may have hurt Sweeney, but they did not violate the Robinson-Patman Act.[3] *See Morton v. National Dairy Products Corp.*, 414 F.2d 403 (3d Cir. 1969), *cert. denied*, 396 U.S. 1006, 90 S.Ct. 560, 24 L.Ed.2d 498 (1970).

Texaco is doing precisely what the Robinson-Patman Act says it should do: it is treating all its distributors equally. That such treatment yields a more advantageous result for one distributor than for another due to factors, such as the location of bulk plants and service stations, solely within each distributor's control cannot convert the practice into a violation of the Robinson-Patman Act. As the Supreme Court has often reminded us, "antitrust laws . . . were enacted for 'the protection of *competi-*

*tion*, not *competitors.*'" *Brunswick v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977), *quoting Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). *See also, American Oil Co. v. FTC*, 325 F.2d 101, 104 (7th Cir. 1963), *cert. denied*, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964).

Indeed, if Texaco adopted the system which Sweeney suggests—giving Sweeney the Westville to Pottstown hauling allowance even though it is cheaper and therefore more economically sound for Texaco to give Sweeney the Macungie to Pottstown hauling allowance—Texaco would likely be subject to claims of price discrimination by Sweeney's competitors.[4] Texaco would then have made Sweeney the preferred purchaser by giving it a price more favorable than the price given to Sweeney's competitors. I will not permit such an anomalous and unfair result.[5]

Moreover, if Texaco adopted a uniform hauling allowance and gave every distributor the same dollar amount regardless of the location of their bulk plant, as Sweeney also seems to suggest, Texaco would be subject to claims of price discrimination by some distributors. Under such a system the hauling allowance would bear no relationship to the distance between the distributor's bulk plant and its pick up point. The

2. When Sweeney objected to this change Texaco agreed to a compromise whereby Sweeney would receive the Macungie to Pottstown rate but be allowed to pick up at either Macungie or Westville. (*See Sweeney I* at 253–254). Whatever Robinson-Patman problems this latter practice may create between Texaco and Sweeney's competitors are not before me at this time and I express no opinion on their resolution.

3. This ruling assumes, as did my previous ruling, that the hauling allowance is not a functional discount and that the requisite sales in interstate commerce have occurred. (*See Sweeney I* at footnotes 61, 62). Since Texaco has taken the position that it did not violate the Robinson-Patman Act, it has not argued the existence of a cost justification defense.

4. These claims would be particularly strong since Sweeney's competitors could argue that Texaco was acting against its own economic interests. *Venzie Corp. v. United States Miner-*

*al Products Co., Inc.*, 521 F.2d 1309, 1315–16 (3d Cir. 1975).

5. Sweeney's request overlooks the import of the extensive federal regulation of the oil industry. I cannot purport to divine the impact which any injunction such as the one Sweeney seeks would have on the regulations applicable to gasoline pricing. The federal regulation of the industry will itself make it difficult for Texaco to engage in discriminatory pricing. Without an allegation that Sweeney's hauling allowance violates any of the applicable regulations, I am reluctant to interfere with a congressional regulatory scheme. Of course, if I had found that Texaco had violated the Robinson-Patman Act or if Sweeney had alleged some violation of these regulations, I would not hesitate to delve into them to ascertain the limits of an appropriate injunction. Absent any finding or allegation to that effect, however, I will not undertake such an expedition.

distributors whose bulk plants are located close to the pick up point would thus receive an advantage over those whose plants are located far from the pick up point. That situation would present the same kind of unfairness condemned by the Supreme Court in the "phantom freight" cases. *See FTC v. Cement Institute,* 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 (1948); *Areeda,* Antitrust Analysis at 307–308, *Rowe,* Price Discrimination under the Robinson-Patman Act, at 87–91.

Texaco could, of course, continue to use its delivered pricing system but insist on delivering the product itself. *Cf. FTC v. A. E. Staley Manufacturing Co.,* 324 U.S. 746, 757, 65 S.Ct. 971, 89 L.Ed. 1338 (1945) (purchasers who have the "natural advantage of proximity" to the seller's plant are entitled to certain price advantages over purchasers at a distance). If Texaco adopted this practice it would deliver the product to the distributor's bulk plant, as provided by the distributor agreement (*See* Plaintiffs' Exhibit 4), and include the cost of delivery in the price charged. Such an arrangement would be disadvantageous to Sweeney,[6] however, and in the absence of a Robinson-Patman Act violation this court can see no reason for requiring Texaco to deprive distributors of the option of either picking up the product themselves or having Texaco deliver it to their bulk plants. As long as these two methods are administered so that they result in equivalent cost to Texaco this court cannot find that Texaco has violated the Robinson-Patman Act by merely giving its distributors the option of which to adopt.[7]

## II. *MISSION AND PETROLEUM'S CLAIMS FOR INJUNCTIVE RELIEF*

Although by order dated June 1, 1979, this court denied Mission and Petroleum's claims for damages under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, and § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), it must now decide whether these plaintiffs are entitled to receive injunctive relief under § 2(a) of the Robinson-Patman Act and § 16 of the Clayton Act.[8]

Mission and Petroleum purchased Texaco gasoline from Sweeney on a cost-plus basis. (Defendant's Exhibits 159, 160; N.T. 536–538). Therefore they claim to have borne the cost of any discrimination experienced by Sweeney. Whatever the accuracy of this allegation, it fails to justify the granting of an injunction on these plaintiffs' behalf. By plaintiffs' own admission, they purchased the product in question from Sweeney, not from Texaco. Thus, like the plaintiff in *Klein v. Lionel Corp.,* 237 F.2d 13 (3d Cir. 1956), plaintiffs Mission and Petroleum are not purchasers within the meaning of the Robinson-Patman Act. *See Kelly v. General Motors Corp.,* 425 F.Supp. 13, 20 n.6 (E.D.Pa.1976). They are not entitled to any relief whatsoever in this lawsuit.

In any event, it follows inexorably from my ruling on Sweeney's entitlement to injunctive relief, Part I, *supra,* that Mission and Petroleum's requests for similar relief must be denied. Mission and Petroleum's claims derive from Sweeney's; their claims can only succeed if Sweeney's claim succeeds. Since Texaco did not violate the Robinson-Patman Act with respect to Sweeney, as I have held, it could not have violat-

---

**6.** Under this system Texaco would use its own trucks or pay a common carrier to transport the product from Macungie to Sweeney's bulk plant in Pottstown. Sweeney would then have to bear the cost of transporting the product from Pottstown to its stations in New Jersey. It would thus be in a worse position than it is now since Texaco now gives it the option of picking up at Westville.

**7.** As *Staley* makes clear, Texaco could lawfully adopt a uniform delivered price system. If by allowing its distributors to pick up it is achieving the same result, and I find that it is, it

cannot be violating the Robinson-Patman Act. The mere use of an alternative means of reaching the same end cannot turn a legal system into an illegal one.

**8.** Mission and Petroleum agree that this is the only issue remaining for the court's decision in light of the grant of Texaco's motion for a directed verdict. *See* note 1 and accompanying text, *supra.*

ed the Robinson-Patman Act with respect to Mission and Petroleum. Thus, even if they could maintain their claims despite *Klein,* Mission and Petroleum's request for injunctive relief would have to be denied.